Phillip Arthur CHAPMAN, Appellant,

v.

The STATE of Texas.

No. 2011/12–02.

Court of Criminal Appeals of Texas.

Sept. 10, 2003.

Edgar A. Mason, Dallas, for Appellant.

Patricia Poppoff Noble, Asst. DA, Dallas, Matthew Paul, State's Atty., Austin, for State.

## OPINION

COCHRAN, J., delivered the opinion of the Court.

While on probation for a sex offense, appellant made unwarned, self-incriminating statements to his therapist during his participation in a court-ordered Sexual Offender Treatment Program. He then repeated these statements when questioned, first by his probation officer, and second by a police officer. We must decide whether appellant's statements were compelled in violation of his Fifth Amendment right against self-incrimination.[1] Because

---

1. We granted appellant's Petition for Discretionary Review on the following issue:

Did the Court of Appeals err in holding appellant's compelled and unwarned statements were admissible against him?

we find that appellant: 1) failed to affirmatively invoke his Fifth Amendment privilege; and 2) was not confronted with the "classic penalty situation" which would have excused that failure, we conclude that appellant's statements were not compelled within the meaning of the Fifth Amendment. We therefore affirm the court of appeals which held that appellant's statements were admissible against him in a subsequent criminal proceeding.[2]

## I

Appellant was serving 10 years' deferred adjudication probation for two 1995 indecency with a child offenses. Appellant's probation terms required him to attend a Sex Offender Treatment Program (SOTP) and to "participate in and comply with all treatments, guidelines and directions given by the sex offender therapist." Appellant also attended a group therapy program for sex offenders administered by Child Protective Services (CPS). Trevor Parr was appellant's CPS group therapist.

Appellant's treatment contract with the SOTP included a lengthy list of specific requirements [3] and informed him that he must participate in good faith, fully disclosing information relevant to his rehabilitation.[4] During therapy, appellant told Trevor Parr and his therapy group that he had sexually molested two other young girls in 1994, for which he had never been charged. Parr called appellant's probation officer, Andy Nation, the following day and told him about the statements. They discussed who should report the disclosures to the police, because both of them were required to report suspected child abuse or neglect to the relevant authorities.[5] At their next probation meeting, Nation asked appellant about his statements to Parr. Appellant repeated his admissions and later provided the girls' names and contact information.[6] Nation, as required by law, then called Officer Dudley Perry at the Mesquite Police Department to report the offenses.

Officer Perry contacted the girls' parents and obtained statements from the children. Perry then called appellant, who met Perry at the station house. After giving appellant the proper *Miranda* warnings, Perry questioned appellant about the allegations; appellant then confessed. The Dallas County District Attorney's Office charged appellant for the two 1994 acts of indecency with a child.

Appellant filed motions to dismiss the indictment and to suppress the statements. During the motion hearings, appellant gave three reasons for disclosing his prior offenses: 1) he thought that if he did not cooperate with his therapist—and later, his probation officer and the police—Parr would drop him from the treatment pro-

---

2. *Chapman v. State*, No. 05–01–00585–CR, No. 05–01–00611–CR, 2002 WL 1870440 (Tex.App.-Dallas August 15, 2002)(not designated for publication).

3. The State notes that this was not the contract for the Child Protective Services (CPS) program, that is, the program that appellant was actually in when he made self-incriminatory disclosures. The two contracts are, however, similar, and neither the State nor appellant consider their differences significant to the issue before us.

4. Specifically, appellant agreed to: follow the group therapist's treatment recommenda-

tions; accept accountability and take responsibility for his sex offenses; complete the treatment plan developed for him by the group therapists; complete all required written assignments in a timely manner; and complete clinical polygraph examinations if required.

5. *See* TEX. FAM.CODE § 261.101.

6. Appellant was the step-father of one of the young girls and the step-grandfather of the other.

gram and he would then be in violation of his probation and possibly be sent to jail; 2) he was concerned about his own rehabilitation; and 3) he was concerned about his victims' recovery.

Regarding his first reason for disclosure, appellant testified that Parr had emphasized the importance of complete honesty to a sex offender's recovery and rehabilitation, and strongly encouraged each therapy group member to give a full sexual history as part of the treatment process. His request was reinforced by the possibility of polygraph testing to determine the accuracy and completeness of the self-disclosure as well as possible termination from the program for non-cooperation.

Appellant said that he understood the terms of his probation agreement to mean that if he failed to successfully complete the treatment program, he "could be brought back before the Court, sentenced and be put in jail." He also said that he felt he could not refuse to answer their questions, and he did not think that charges could be filed against him because of his statements. According to appellant, Parr did not tell him that he would turn the information over to authorities until after he (appellant) had already disclosed the uncharged conduct. Appellant further stated that he "would have had second thoughts" about revealing the incriminating information and would not have revealed it if he had known he could go to prison for it. However, appellant also admitted to the trial judge that he had actually known in advance that Parr would inform the police of his statements:

COUNSEL: Mr. Chapman, in these group sessions you were involved in, you were never given any Miranda warnings in those group sessions, were you?

APPELLANT: No, I wasn't.

COUNSEL: They never told you if you made these revelations that whatever you said might be used—would be used against you in a court of law, did they?

APPELLANT: No.

COUNSEL: Did they ever tell you that they would go down and file criminal cases on you if you—if you revealed that you had sexually offended?

APPELLANT: They—they told me that—they didn't tell me that they would file charges, but they would tell—were required by law to tell the police department.

THE COURT: When did they tell you that?

APPELLANT: It was all through my—my time period that I was going to CPS that this was reiterated over.

THE COURT: So you knew that before you even said anything to Mr. Parr; is that correct?

APPELLANT: Yes.

THE COURT: Okay.

Appellant's second and third reasons for disclosure were interrelated. When asked by his counsel, "Why did you make a clean [breast] of things and tell your therapist about these two prior incidents ... ?" Appellant answered: "Well, I wanted to tell these offenses because I wanted to do this program of recovery, and second, last but not least[,] there be a recourse of rescue for the children that I had harmed." Appellant testified that, despite Parr's urging that sex therapy members give a full sexual history, he did not tell his therapist about the other offenses for several months, not until a friend gave him *Just Before Dawn*, a book intended to help child sexual abuse offenders empathize with their victims and understand the lifelong effects of the offender's conduct on the children. Appellant agreed that reading the book had been a catalyst for his disclo-

sures. When he read the book, he "felt bad for the children" and "wanted to do the right thing." Thus, *he* approached Parr and told him about the prior offenses voluntarily. He made his self-incriminating admissions without any direct questions from his therapist. Appellant further agreed that his therapist did not threaten him in any way or say that if he did not reveal other sexual conduct he would be sent to prison. He also said that he went to the police station voluntarily.

The trial judge denied appellant's motions. Appellant then pleaded guilty to the two offenses and the trial judge sentenced him to 20 years in prison.

In the court of appeals, appellant argued that the trial court erred in refusing to grant his motion to dismiss because the State had violated his right against compelled self-incrimination under the Texas and United States Constitutions. Specifically, appellant argued that the SOTP terms required him to reveal his past sexual history, under pain of polygraph examination, and thus forced him to choose between waiving his Fifth Amendment right against self-incrimination or suffering revocation of his probation for refusing to cooperate. In an unpublished opinion, the court of appeals disagreed, holding, among other things, that the Fifth Amendment right against self-incrimination is not self-executing and that appellant had not

shown that he had ever asserted his right against self-incrimination.[7] Before this Court, appellant argues that the court of appeals erred when it found that his statements were not compelled and were therefore admissible.

## II

■ It is a fundamental tenet of Texas and federal constitutional jurisprudence that every person has the right to avoid self-incrimination by exercising the privilege provided him by the Fifth Amendment and the Texas Constitution.[8] He may choose to remain silent rather than to respond to questions when the answers to those questions would tend to incriminate him.[9] The privilege applies not only to an accused's right to refuse to testify in criminal proceedings, but also permits him "not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."[10]

■ A criminal defendant does not lose this constitutional protection merely because he has been convicted of a crime.[11] " '[T]he privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites.' "[12] A person who has been convicted of a crime, is in prison or

7. *Chapman,* slip op. at 4.

8. The Fifth Amendment to the United States Constitution states, in pertinent part, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." The parallel provision under the Texas Constitution states: "[i]n all criminal prosecutions the accused ... shall not be compelled to give evidence against himself." TEX. CONST. art. I, § 10.

9. *Minnesota v. Murphy,* 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984).

10. *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973).

11. *Murphy,* 465 U.S. at 426, 104 S.Ct. 1136; *see also Baxter v. Palmigiano,* 425 U.S. 308, 316, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976).

12. *Estelle v. Smith,* 451 U.S. 454, 462, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (citation omitted).

on probation still has a right against self-incrimination concerning statements that would incriminate him for some other offense.[13] As the State acknowledged in its brief:

> The State could not constitutionally carry out a threat to, and could not legally, revoke probation for refusing to answer questions calling for information that would incriminate the Appellant in separate criminal proceedings. He was not, and could not be, required to jeopardize his conditional liberty by remaining silent, a legitimate exercise of the Fifth Amendment privilege.

Thus, the fact that appellant was on probation for a criminal sexual offense did not itself diminish his Fifth Amendment privilege against self-incrimination.

■■■ On the other hand, as the court of appeals correctly stated, this privilege against compelled self-incrimination is not ordinarily self-executing. In all but a few specific situations, a criminal defendant must timely assert his privilege:

> 'The [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been "compelled" within the meaning of the Amendment.' [14]

13. *Murphy*, 465 U.S. at 426, 104 S.Ct. 1136.

14. *Murphy*, 465 U.S. at 427–28, 104 S.Ct. 1136 (quoting *United States v. Monia*, 317 U.S. 424, 427, 63 S.Ct. 409, 87 L.Ed. 376 (1943)).

15. *Garrity v. New Jersey*, 385 U.S. 493, 496, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (internal quotation omitted). In *Garrity*, the witnesses, police officers who were being investigated for misconduct, were told that they could remain silent, but that if they did so, they

Thus, the critical question is whether appellant affirmatively invoked his right against self-incrimination, and if not, whether the facts in this case fall within "the classic penalty situation" exception to this general rule, thereby relieving him of the responsibility to assert his privilege.

Appellant has not argued, or offered any evidence, that he affirmatively invoked his right against self-incrimination before he told his therapist, his probation officer, and Officer Perry of his two other sexual offenses. Therefore, we turn to the second issue, whether the facts of this case made it unnecessary for appellant to assert his right against self-incrimination. For the reasons discussed below, we find that the answer to this question is "No."

### III.

■■■ In the classic penalty situation, a person is threatened with punishment for relying upon his Fifth Amendment privilege. The Supreme Court has identified the key inquiry in this penalty situation as "whether the accused was deprived of his free choice to admit, to deny, or to refuse to answer." [15] The leading "penalty" case on the use of self-incriminating statements made by probationers is *Minnesota v. Murphy*,[16] in which the Supreme Court held that the defendant's failure to invoke his Fifth Amendment privilege was not excused.[17] As explained in *Murphy*:

"would be subject to removal from office." *Id.* at 494, 87 S.Ct. 616. Severe penalties were attached to the exercise of their Fifth Amendment right, thus any statements they made under these circumstances were the result of compulsion and could not be used against them in any later criminal proceeding. *Id.* at 497–501, 87 S.Ct. 616.

16. 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984).

17. *Id.* at 440, 104 S.Ct. 1136.

[I]f the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.[18]

Like appellant, Marshall Murphy was on probation for a sex offense.[19] Murphy's probation conditions, like appellant's, required him to participate in a sexual offender treatment program, to report to his probation officer as directed, and to "be truthful with the probation officer 'in all matters.'"[20] Murphy was told that if he did not comply with these conditions, he could be returned to the sentencing court for a probation revocation hearing.[21]

Murphy's therapist informed the probation officer that Murphy had admitted to committing an earlier rape and murder unrelated to his probation offense.[22] When the probation officer met with Murphy, she told him, without first giving him *Miranda* warnings, about the therapist's information.[23] During the course of the probation meeting, Murphy admitted committing the uncharged rape and murder to her as well.[24] The probation officer then informed police of Murphy's self-incriminating statements, and, shortly thereafter, he was arrested, charged, and convicted of first-degree murder.[25]

Murphy appealed, arguing that his motion to suppress the self-incriminating statements should have been granted because he was subjected to a classic penalty situation: he was required, by the terms of his probation, to speak fully and truthfully or remain silent and risk the possibility of having his probation revoked.[26] Although the Supreme Court ultimately rejected Murphy's contention, it explained that "[t]he threat of punishment for reliance on the privilege distinguishes cases of this sort from the ordinary case in which a witness is merely required to appear and give testimony.".[27] In the latter case, the witness must invoke his privilege; if he does invoke the privilege, then he cannot be compelled to testify against himself unless granted use-immunity.[28] Similarly, the normal probation conditions, such as a stipulation that the probationer appear and discuss matters that affect his probationary status, does not relieve him of the responsibility to assert his privilege if he fears that his answers may incriminate him.[29]

The critical inquiry is whether a state has gone beyond merely requiring a probationer to appear and speak on matters relevant to his probationary status or "whether [it goes] further and require[s]

---

18. *Id.* at 435, 104 S.Ct. 1136.

19. *Id.* at 422, 104 S.Ct. 1136.

20. *Id.*

21. *Id.*

22. *Id.* at 423, 104 S.Ct. 1136.

23. *Id.* at 423–24, 104 S.Ct. 1136.

24. *Id.* at 424, 104 S.Ct. 1136.

25. *Id.* at 424–25, 104 S.Ct. 1136.

26. *Id.* at 422–25, 104 S.Ct. 1136.

27. *Id.* at 435, 104 S.Ct. 1136.

28. *Id.* at 427–29, 104 S.Ct. 1136. Thus a state may "validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be *used* in a criminal proceeding and thus eliminates the threat of incrimination." *Id.* at 435, n. 7, 104 S.Ct. 1136.

29. *Id.* at 436–37, 104 S.Ct. 1136.

him to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent." [30] In Murphy's case, the Court determined that the state had not crossed this boundary, and therefore Murphy was not excused from his obligation to assert his privilege because:

1) Murphy's obligation was no different from the obligation placed on any trial witness, who could also be compelled to appear and who also must either: a) answer truthfully, under penalty of perjury, or b) timely assert his Fifth Amendment privilege; [31]

2) Murphy's probation terms explicitly prohibited only *false* statements, but were silent regarding the consequences should a probationer choose to exercise his Fifth Amendment privilege and refuse to answer potentially self-incriminating questions; [32]

3) There was no direct evidence that Murphy confessed because he was threatened with the revocation of his probation; [33] and

4) Even if Murphy subjectively believed that his probation would be revoked for exercising the privilege, that belief would not be objectively reasonable because "[the Court's] decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for a legitimate exercise of the Fifth Amendment privilege." [34]

For these reasons, the Court could not "conclude that Murphy was deterred from claiming the privilege by a reasonably perceived threat of revocation." [35]

## IV.

■ The Supreme Court's reasoning in *Murphy* is directly applicable to this factually similar case and leads us to conclude that appellant was not subjected to a classic penalty situation.

First, state authorities did not either expressly or impliedly state that appellant's probation would be revoked if he chose to invoke his Fifth Amendment privilege. At most, appellant's probation and treatment contract informed him that the successful completion of his probation might be jeopardized if he failed to comply with the terms of the treatment program. There was no evidence that Parr stated that he would automatically drop appellant from the treatment program (and thus, jeopardize his conditional liberty) if he refused to answer a direct question about uncharged criminal conduct.

Second, and most importantly, Parr never asked appellant directly about his sexual history. Appellant testified that *he* approached Parr with the information. And he did so for laudable reasons. When his counsel asked him why he had told his therapist about the two prior instances of child molestation, appellant answered:

---

**30.** *Id.* at 436, 104 S.Ct. 1136.

**31.** *Id.* at 437, 104 S.Ct. 1136.

**32.** *Id.* Given that " '[at] this point in our history virtually every schoolboy is familiar' " with the rights afforded by the Fifth Amendment, the Court said, it was Murphy's responsibility to seek clarification of the parameters of this particular requirement. *Id.* (internal citation omitted).

**33.** Murphy was not "expressly informed during the crucial meeting with his probation officer that an assertion of the privilege would result in an imposition of a penalty." *Id.* at 437–38, 104 S.Ct. 1136.

**34.** The Supreme Court noted that the State was certainly under no illusion to the contrary and stated as much in its brief. *Id.* at 438, 104 S.Ct. 1136.

**35.** *Id.* at 439, 104 S.Ct. 1136.

"Well, I wanted to tell these offenses because I wanted to do this program of recovery, and second, last but not least[,] there be a recourse of rescue for the children that I had harmed." He explained that he "felt bad for the children" and "wanted to do the right thing." And he also explicitly stated that he went to the police department voluntarily, was given appropriate *Miranda* warnings, waived those rights and voluntarily gave two written confessions about the prior offenses.

Appellant now argues that he thought his disclosures to Mr. Parr would be kept confidential, but there is no evidence that Mr. Parr ever stated or suggested that he would not disclose a group therapy member's confession of crime to that person's probation officer or the police. Quite the contrary—the paragraph of the treatment contract immediately above appellant's signature expressly warned him that "local or state police may be contacted if necessary to maintain victim or community safety." Indeed, appellant said that his therapists repeatedly told him, before he said anything to Mr. Parr, that "they were required by law to tell the police department" about any other sexual offenses. Furthermore, appellant testified that he wanted to do the right thing to help the children whom he had abused, but they could hardly be helped if no one knew their names or knew that appellant, their step-father or step-grandfather, had abused them. There is ample evidence in this record to support the trial court's implicit finding that appellant was compelled to speak by his own conscience, not by any explicit or implicit external threat of punishment.

We disagree with appellant's contention that *Murphy* is distinguishable from his case and further find that appellant's reliance on *State v. Fuller*,[36] and *Lile v. McKune*,[37] is misplaced. Although both cases involve participation in sexual offender treatment programs, we find that the similarities end there.

The treatment program in *Fuller* expressly *required* the probationer to fully disclose his offense history or his probation *would* be revoked and he *would* be sent to prison.[38] The Montana Supreme Court found that, unlike in *Murphy*, the district court "threatened to send [the probationer] to prison if he did not honestly disclose his offense history. It therefore threatened a real and significant punishment if he remained silent."[39] In both *Murphy* and the present case, however, the State did not, either overtly or impliedly, make the demand: "Confess all sex offenses or be punished." Here, as in *Murphy*, the probationer's probation condition proscribed only false statements; "it said nothing about his freedom to decline to answer particular questions."[40]

Similarly, in *Lile*, prison officials "recommended" that Lile, a sex offender inmate, participate in a Sexual Abuse Treatment Program (SATP), but before he could be admitted into the program he had "to disclose his sexual history, including the crime of which he was convicted and any uncharged sexual offenses."[41] When Lile declined to participate in the SATP because the required disclosure of his criminal history would violate his Fifth

**36.** 276 Mont. 155, 915 P.2d 809 (1996).

**37.** 224 F.3d 1175 (10th Cir.2000), *rev'd*, 536 U.S. 24, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002).

**38.** *Fuller*, 915 P.2d at 811, 813.

**39.** *Id.* at 814.

**40.** *Murphy*, 465 U.S. at 437, 104 S.Ct. 1136.

**41.** 224 F.3d at 1178.

Amendment privilege against self-incrimination, he was told that his privilege status would be reduced and he would be transferred to a maximum-security unit.[42] He sued under the federal civil rights statute, requesting an injunction to prevent the prison officials from punishing him for refusing to participate in the SATP. The Tenth Circuit found that the threat of *automatic* restriction of privileges and transfer to a maximum security facility constituted impermissible compulsion. That court stated:

> The second consideration that bears on whether the government has sought to compel self-incrimination is the automaticity of the penalty.... We believe that the distinction between an automatic and a conditional consequence is helpful in determining whether government action rises to the level of compulsion.... It remains worth noting that ... the adverse consequences in this case would

be imposed on [Lile] automatically once he refused to admit responsibility and disclose his sexual history and thereby refused to participate in the SATP.[43]

In the present case, by contrast, appellant was never put into this automatic "confess all sex offenses or be punished" dilemma. He now argues that if he "had refused [to] answer the sexual history requirement, he would have been terminated from the Sex Offender Treatment Program thereby violating his probation and jeopardizing his freedom." There is no evidence in the record to support this assertion. There is no evidence that anyone attempted to compel appellant to answer any "sexual history" questions. The SOTP contract that appellant signed contains no requirement that he disclose his entire sexual history or admit to uncharged misconduct as was required in both the *Fuller* and *Lile* programs. There is no evidence that, had he been directly asked and had

---

42. *Id.* at 1181.

43. *Id.* at 1189. Nonetheless, as appellant acknowledges, a divided Supreme Court, on review of *Lile,* disagreed with the Tenth Circuit, and held that the automatic consequences to the inmate for refusing to participate in the SATP were not so onerous as to amount to compulsion under the Fifth Amendment. *McKune v. Lile,* 536 U.S. 24, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002). A plurality of the Court held that the adverse consequences Lile faced as a result of his refusal did not "constitute atypical and significant hardships in relation to the ordinary incidents of prison life[,]" and thus there was no unconstitutional compulsion. *Id.* at 37–41, 122 S.Ct. 2017. Justice O'Connor concurred, stating that the particular penalty Lile suffered by invoking his Fifth Amendment right was simply not "so great as to constitute compulsion for the purposes of the Fifth Amendment privilege against self-incrimination." *Id.* at 48–49, 122 S.Ct. 2017 (O'Connor, J., concurring). In sum, neither the Tenth Circuit nor the Supreme Court opinions in *Lile* support appellant's argument. *See also Ainsworth v. Stanley,* 317 F.3d 1, 2–6 (1st Cir.2002) (following *Lile* and holding that requiring sex offender

inmates to disclose their histories of sexual misconduct to participate in voluntary sex offender program does not violate their Fifth Amendment right against self-incrimination); *Searcy v. Simmons,* 299 F.3d 1220, 1225–27 (10th Cir.2002) (following *Lile* and holding that the "pressure" imposed upon prison inmate for refusing to give sexual history for the SATP did not rise to a level of unconstitutional compulsion), *cert. denied,* —— U.S. ——, 123 S.Ct. 1908, 155 L.Ed.2d 825 (U.S.2003); *State v. Pritchett,* 69 P.3d 1278, 1285–87 (Utah 2003) (following *Lile* and holding that statute requiring sex offenders to admit culpability for the offense for which they has been convicted before being considered for probation did not violate Fifth Amendment right against compelled self-incrimination; the grant of probation is a privilege for which the State may require an admission of culpability); *Dzul v. State,* 56 P.3d 875, 884–85 (Nev.2002) (following *Lile* and holding that sex offender's denial of responsibility during pre-sentencing psychosocial interview which may result in denial of probation does not amount to compulsion under Fifth Amendment).

he refused to answer, invoking his Fifth Amendment right against self-incrimination, appellant would have been terminated from the SOTP. There was no evidence that appellant would suffer *any* automatic penalty if he invoked his Fifth Amendment right not to disclose his prior sexual offenses. Indeed, the State has repeatedly acknowledged that the trial judge could *not* revoke appellant's probation simply because he invoked his right against self-incrimination. Here, unlike the prison policy in *Lile*, appellant's probation status was not automatically contingent upon his disclosure of prior sexual offenses.

In sum, this record does not support any "speak or be punished" penalty situation. Because appellant did not affirmatively invoke his Fifth Amendment right against self-incrimination, we hold that the trial court did not err in denying appellant's motions to dismiss and to suppress his voluntary statements to his therapist, his probation officer, and the police. We therefore affirm the decision of the court of appeals.