

RECEIVED
COURT OF APPEALS
MAY 1 0 2013
LISA MATZ
CLERK, 5th DISTRICT

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0613-12

### MICHAEL EDWARD DANSBY, SR., Appellant

v.

### THE STATE OF TEXAS

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE FIFTH COURT OF APPEALS
## KAUFMAN COUNTY

PRICE, J., delivered the opinion of the Court in which MEYERS, WOMACK, JOHNSON, COCHRAN and ALCALA, JJ., joined. KEASLER, J., filed a dissenting opinion in which KELLER, P.J., and HERVEY, J., joined.

## OPINION

The appellant argued on direct appeal that his deferred adjudication community supervision was revoked unconstitutionally as a penalty for invoking his Fifth Amendment privilege against self-incrimination by refusing to answer questions during the course of a court-imposed sexual history polygraph examination about past sexual assault offenses. In an unpublished opinion, the Dallas Court of Appeals declined to reach that issue, holding that

the appellant's community supervision had been legitimately revoked on another basis—that he failed to successfully complete the court-ordered sex offender treatment program that the sexual history polygraph was designed to facilitate.[1] We granted the appellant's petition for discretionary review to address the appellant's contention that he was essentially discharged from the treatment program *because* he refused to answer incriminating questions during the course of the sexual history polygraph, and the court of appeals therefore improperly dodged his constitutional claim. We will reverse the judgment of the court of appeals and remand the cause for further consideration of the case not inconsistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

Although originally charged with aggravated sexual assault, on July 9, 2008, the appellant pled guilty to the lesser offense of indecency with a child for molesting his granddaughter. The trial court placed him on five years' deferred adjudication community supervision and ordered him to begin a sex offender treatment program and to submit to polygraph examinations at the discretion of his community supervision officer. The appellant agreed to these conditions and, over the course of the next year, faithfully attended approximately fifty group therapy sessions and passed two "maintenance" polygraph examinations designed to make sure that he was complying with the requirements of his

---

[1] *Dansby v. State*, No. 05-10-00866-CR, 2012 WL 1150530 (Tex. App.—Dallas, delivered Apr. 9, 2012) (not designated for publication).

community supervision. He was also eventually required to submit to a sexual history polygraph, and so, on April 6, 2009, he appeared at polygrapher Andy Sheppard's office. When it became clear during the preliminary conference with Sheppard that he would be asked questions about extraneous prior sexual offenses he may have committed, however, the appellant advised Sheppard that "his attorney told him not to say anything that might result in a prosecution." Sheppard believed he "was left no other option than to terminate the interview."

On August 18, 2009, the appellant was discharged from the sex offender treatment program. The State subsequently filed a motion to proceed to adjudication, alleging two grounds for revocation of his community supervision. First, the motion alleged that the appellant "violate[d] condition (30) in that he refused to obtain a sexual history polygraph as [r]equested by the Community Supervision Officer & Counselor." Second, the motion alleged that he "violate[d] condition (36) in that [he] failed to attend and successfully complete the Sex Offender Treatment Program."[2] The trial court convened a hearing on the State's motion to proceed to adjudication on March 30, 2010.

---

[2] Condition thirty-six required the appellant to begin an approved sex offender treatment program within ten days of being placed on deferred adjudication probation, to pay the costs of the program, abide by its rules, and "not leave the program [until] successful completion or unless you have the permission of the court or your supervising officer." Strictly speaking, the appellant did not fail to attend the program as alleged in the motion to revoke. The evidence at the hearing on the motion to revoke conclusively establishes that he attended every group and individual therapy session without fail—at least until he was involuntarily discharged from it. Nor did he "leave the program" of his own volition, as literally prohibited by the actual condition of community supervision.

Three witnesses testified at the hearing. The State's first witness was Sheppard, the polygrapher. He testified that, mindful of a probationer's Fifth Amendment privilege against self-incrimination during a sexual history polygraph,

> I avoid asking about any names, any specific identifiers of another victim, an address where it may have occurred. Anything that would basically put me in a position where I would have to contact a law enforcement agency or child protective services to make a report. So, the effective way I do that is to ask for the victim's age, and the offender's age at the time that the offense occurred. Was the victim a male or a female? Was it a stranger or an acquaintance? And, no more specific than that. And, then what did the offender do to the victim and how many times. And, that gives us strictly a chronological and a behavioral look at what the offender had done without causing the offender to have to incriminate himself.

When Sheppard explained this to the appellant at the start of the polygraph examination on April 6, 2009, the appellant "responded by telling [Sheppard that] his attorney told him not to say anything that might result in a prosecution." On cross-examination, Sheppard confirmed that the purpose of the sexual history polygraph was to determine the "truth and veracity" of the appellant's statements about "[d]eviant sexual behavior, and sexual crimes" against victims of offenses other than that for which he was placed on community supervision. He also acknowledged that the appellant had answered all questions straightforwardly and truthfully during the two maintenance polygraph examinations that Sheppard administered to him.

The State next called Linda Young, the appellant's sex offender therapist who discharged him from the program. Young testified that certain psychological testing she

conducted on the appellant suggested to her that "truthfulness might [be] an issue" for him and that he was mistrustful of other people, making it difficult for him "to be open and honest in treatment." He also displayed certain personality disorder traits that led her to suspect that he might prove deceitful and attempt to deflect blame. The primary goal of sex offender treatment, she maintained, is "not to have anymore [sic] victims." To this end, she insisted, the sexual history polygraph is necessary because

> it's critical to have that information because we can't – unless we know this person, and unless we know how they – unless we really know how they respond, how they responded in the past because that's our best producer, a future behavior is past behavior at this point. So, we have to know these things.

Although the appellant attended therapy sessions regularly and superficially acknowledged responsibility for his offense, Young maintained that he never took "ownership" of it:

> A No, that was a boundary for [the appellant]. He acknowledged the offense and would [give] us some [underlying] beliefs that he said he had, and that was about as far as we could go because, we didn't have any history of prior negligent behavior.
>
> Q How many times did he actually say, I did this, in group?
>
> A I don't know. I can't tell you, but he did.
>
> Q Was it fifty times in group that he showed up every time and said, I did this, it's my fault?
>
> A I doubt that, no. But, I mean, toward the end after – after, you know, a certain amount of time he did acknowledge – he did verbally take responsibility.
>
> Q Now, did you ever get, at all, the next step of identifying his

[underlying] beliefs?

A  Not totally.  Like I said, before we can really do that we have to know the person well.  And, that never happened because, he didn't allow himself to be vulnerable enough to give us that kind of information.

Although Young would expect an offender of the appellant's type to have "impure thoughts" from time to time, the appellant never admitted to fantasizing or indulging in pornography during group sessions.  He was "guarded" in therapy and "had a hard time participating in terms of his own deviance."  The appellant had himself been victimized as a child, and

early on that was an issue, and he felt like because of his own history that was a big reason he offended, yes.  Being – feeling victimized, feeling special, feeling unique, all of those are thinking areas that they engage in. [The appellant] engaged in quite regularly.

Q  Does [the appellant] even understand that he is a risk?

A  No, I don't think so.

Q  Does that concern you?

A  Well, yes.  It's almost like a line they have to cross.  They have to fully understand that this is something – the sexual – deviance or sexual desire is something that they're probably not going to get better, it's not going to go away. And, so they have to learn to control it.  And, that's really hard for them to acknowledge.  They feel like they are cured, it's never going to happen again, that kind of thing.

Q  Now, what kind of reaction – what is the reaction of other offenders in group to [the appellant]?

A  They worked really hard at helping [the appellant] trying to help him understand about the sexual history polygraph, the sexual history itself, they gave him information from their own experiences and they are – they were quite irritated with him at the end.

* * *

Q So, why are they irritated with [the appellant]?

A Well, they took the sexual history polygraph, they [have] done sexual history, they have to talk about their horrible behavior, and they kind of figure if they have to they want him to as well.

Asked why she believed the appellant remained a risk to re-offend, Young replied,

A Because, he hasn't been in treatment very long and when he was in treatment he didn't comply with the requirement. So, he really didn't get a lot during that process.

Q So, did he successfully complete treatment as ordered by the court?

A No.

Q Was the not taking the polygraph [ . . . ] the only reason that he got thrown out of sex offender treatment?

A No, it's not at all. He couldn't participate because he would of had to disclose information, and he was unwilling to do that. So, he was guarded and his participation was not on target in terms of his own issues, his attitude stunk there at the end, and he just wasn't getting anywhere.

Q Can you give the Judge an example of his bad attitude?

A He just would refuse to talk. We would ask him a question and he would just sit there.

Young believed that the appellant's reticence was disruptive of the group because "we certainly spent a lot of time with him, that might have been spent elsewhere."

On cross-examination, Young admitted that, in the last paragraph of a letter she had written, on August 21, 2009, to inform the appellant's community supervision officer, Kirk

Mann, that the appellant had been discharged from the sex offender treatment program, she had indicated that the sexual history polygraph "is a necessary part of the treatment process." She acknowledged that her "particular brand" of sex offender therapy "cannot be successfully implemented" if the appellant "will not disclose or discuss his alleged prior acts of sexual conduct." Nevertheless, she continued to deny that his refusal to submit to the polygraph was the only reason he was discharged from the treatment program. Still, she opined that she did not believe any treatment program could work that did not take past sexual misconduct into account, "[b]ased on what I have seen over the last twenty years, as far as, offenders and until they acknowledge who they are, and what they've done, and the problems that they have, as far as being successful it's pretty trivial." On re-direct examination, Young read aloud the balance of her letter to Mann, in which she identified other factors in her decision to discharge the appellant:

> [The appellant] spent much of his time in group "lying and conning." When confronted, he was highly insulted to think that anyone would believe he could have done, what in fact, he did do. [His] group participation was minimal. Occasionally, he will confront others, but provides very little information regarding his own deviance. He is very guarded and most of his replies are brief or he does not answer at all.

Such an offender, she confirmed, will not ordinarily "last very long in treatment."

The trial court then questioned Young specifically about a progress report she had prepared regarding the appellant's treatment for the reporting period between March 30, 2009, and May 15, 2009, which included the date (April 6th) the appellant had refused to

answer questions during the sexual history polygraph examination:

> THE COURT: I am looking at your comments and the attorneys well know what is written there[,] they've reviewed all this. It appears to me that you had a glimmer of hope. [The appellant] seems to understand that he is not the victim, his journaling has improved dramatically and he is presenting the correct – I think you meant thought process. You say he's still manipulative regarding his sexual history polygraph that – you left it at that. Just from the tone, the tenor of that entry it seems you were hopeful?

> THE WITNESS: There was a time, a brief time where it looked like he was going to be okay. It looked like he was going to make it.

> THE COURT: Tell me in your words, what happened from that entry until the next one?

> THE WITNESS: Well, I think that we kept pressing him for the polygraph, he became more and more guarded, and participation just dropped from there.

In her last progress report regarding the appellant's treatment, for the reporting period that spanned June 30, 2009, to August 4, 2009, Young's comments read as follows:

> [The appellant] continues to resist complying with treatment–participation is almost non-existent–he seems afraid he will be asked to disclose information–he cannot continue to remain in group with this lack of compliance–If he has not completed his polygraph confirming his sexual autobiography as being accurate by August 15, 2009, he will be discharged from this group. It is my concern that [the appellant] may be at risk to offend.

The appellant persisted in his refusal to submit to the sexual history polygraph examination by the appointed date of August 15th, and three days later he was discharged.

After Young testified, the State rested, and the appellant called as his only witness his community supervision officer, Mann. Mann initially agreed that the appellant was

discharged from the sex offender treatment program "because he failed to complete a sexual history polygraph[,]" but he immediately denied, without elaboration, that this was "the only reason[.]" He admitted that "several times" an offer was made to the appellant to withdraw the motion to revoke his community supervision if the appellant would agree in exchange to "get back into counseling, take a sexual history polygraph and make progress[,]" but the appellant refused. Asked whether that offer would have stood without the necessity of the polygraph, Mann replied, "No, sir, because the State requires it in all of the programs."

In final arguments to the trial court, counsel for the appellant asserted that the State's entire case for proceeding to adjudication was "all about the polygraph exam," and that to revoke the appellant's community supervision would amount to an unconstitutional penalty on his invocation of the Fifth Amendment privilege to refrain from incriminating himself. In response, the prosecutor argued:

> And, as far as, the polygraph examination, I will concede to the defense that if that is the only reason why we were here, that he was the stereotypical probationer and he just got where he wouldn't take those polygraphs, and we wouldn't even be here, if he was just saying, Fifth Amendment, I invoke it, but beyond that he's being great in participating in group and he's identifying being sexually attracted to little girls and being an excellent participant, we wouldn't be here. The bottom line is, that is one way he has failed of many. It's clear from Ms. Young that when we started back here in July, of 2008, we had a sixty-two year old man with a persistent deviant interest in young female children at adolescent and grade school age. With a desire to be well viewed, and a propensity to lie. With antisocial and personality disorderations [sic]. Someone prong [sic] to playing the con man and the victim. Who distrusted people and was unwilling to make disclosures. And, by August of 2009, what do we have? A sixty-three year old man who has persistent deviance interest in young children and fill in the rest. And, Ms. Young testified to you that the

effect of difference between the sixty-two year old Mike Dansby and the sixty-three year old Mike Dansby is effectively zero. That all of those fifty sessions of counseling yielded zip. That they barely progressed into the very first state of acknowledging his offense and that he stands before you a troubling risk to reoffend.

Without elaboration, the trial court then found that the appellant had violated both conditions thirty and thirty-six of his deferred adjudication community supervision and entered a finding of guilt on the indecency-with-a-child offense. A week later, after a punishment hearing, the trial court refused to place the appellant on regular community supervision, sentencing him instead to serve an eighteen-year sentence in the penitentiary.

In two points of error on appeal, the appellant argued that to revoke his deferred adjudication community supervision and proceed to adjudicate his guilt for failing to answer incriminating questions during the sexual history polygraph examination was tantamount to penalizing him for asserting a valid Fifth Amendment privilege. The court of appeals held, however, that adjudicating the appellant guilty based upon his violation of condition thirty-six, the failure to successfully complete the sex offender treatment program, did not implicate his Fifth Amendment privilege.[3] Because it was able to identify a basis for revocation that was supported by the record without implicating the appellant's Fifth Amendment privilege, the court of appeals declined to reach the question whether the trial court had validly proceeded to adjudication based upon the appellant's violation of condition thirty, the failure

---

[3]    *Dansby, supra*, at *5 ("Viewed in the light most favorable to the trial court's ruling, we conclude the trial court could have held a reasonable belief that appellant violated condition thirty-six for reasons other than invoking his Fifth Amendment privilege.").

to submit to the sexual history polygraph.[4] We granted the appellant's petition for discretionary review in order to evaluate his contention that the court of appeals erred in concluding that the evidence supporting a violation of condition thirty-six constitutes a basis for adjudication that is genuinely independent of any unconstitutional infringement upon his Fifth Amendment privilege. We conclude that the court of appeals did err and will remand the cause for that court to address the merits of the appellant's Fifth Amendment arguments.

## THE FIFTH AMENDMENT PRIVILEGE

Under the Fifth Amendment to the United States Constitution, no person "shall be compelled in any criminal case to be a witness against himself[.]"[5] It is well settled that the Fifth Amendment insulates probationers from compelled self-incrimination.[6] Supreme Court decisions have "made clear" that a state may "not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege."[7] Thus, while a probationer may be compelled "to appear and give testimony about matters relevant to his probationary status[,]" he cannot be "required . . . to choose between making incriminating

---

[4]

*Id.*

[5]

U.S. CONST. amend. V.

[6]

*Minnesota v. Murphy*, 465 U.S. 420, 426 (1984); *Chapman v. State*, 115 S.W.3d 1, 5-6 (Tex. Crim. App. 2003).

[7]

*Murphy, supra,* at 438.

statements and jeopardizing his conditional liberty by remaining silent."[8] It bears emphasis "that a State may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminate the threat of incrimination."[9] But the appellant in this case was offered no such use immunity. The State cannot reasonably have believed that it could penalize him for invoking his Fifth Amendment privilege by revoking his conditional liberty *solely* on the basis of his refusal to answer questions that would tend to incriminate him during the course of the sexual history polygraph process—or, for that matter, during required sex offender group therapy sessions.[10]

The court of appeals avoided the constitutional issue, however, relying on this Court's many holdings that "[t]he State is obligated to prove only one of the violations alleged in the motion to revoke or proceed to judgment in order to authorize the trial court to revoke

---

[8]

*Id.* at 436.

[9]

*Id.* at 436 n.7; *Chapman, supra*, at 7 n.28.

[10]

*Murphy, supra*, at 438-39; *Hoffman v. United States*, 341 U.S. 479, 486 (1951) (the Fifth Amendment privilege is to be "accorded liberal construction in favor of the right it was intended to secure[,]" and "not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute"). The privilege applies unless "it is perfectly clear . . . that the answer cannot possibly tend to incriminate the witness." *Grayson v. State*, 684 S.W.2d 691, 696 (Tex. Crim. App. 1984). As Judge Cochran has recently observed, "[t]hat is a high hurdle to jump." *Ex parte Dangelo*, 376 S.W.3d 776, 782 (Tex. Crim. App. 2012) (Cochran, J., concurring).

community supervision or to proceed to judgment."[11] But this principle cannot operate to excuse the court of appeals from addressing the appellant's asserted Fifth Amendment issue if the one ground for revocation that it found to be supported by the evidence is equally infected with constitutional infirmity as the ground for revocation for which it abjured reliance. The question presently before us boils down to simply this: Was the appellant's discharge from the sex offender treatment program a product of his invocation of a Fifth Amendment privilege?[12] We hold that the court of appeals erred to conclude that it was not.

## ANALYSIS

As he does here, the appellant contended on direct appeal that, "had he taken the sexual history polygraph, he would still be in the treatment program[,]" and that "his ultimate violation of condition thirty-six was derived from his not wanting to incriminate himself."[13] The court of appeal rejected this contention, not only because of Young's and Mann's specific testimony that the appellant's failure to submit to the sexual history polygraph was "not the only reason" for his discharge, but also because "the information sought in counseling addressed more than just subjects that might have caused appellant to incriminate

---

[11]

George E. Dix & John M. Schmolesky, 43A TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 48:57, at 436 & n.1 (3rd ed. 2011) (citing, "e.g.," Jones v. State, 571 S.W.2d 191, 193-94 (Tex. Crim. App. 1978); Gobell v. State, 528 S.W.2d 223, 224 (Tex. Crim. App. 1975); Ross v. State, 523 S.W.2d 402, 404 (Tex. Crim. App. 1975)).

[12]

The question of whether that invocation is legitimate is not before us at this juncture.

[13]

Dansby, supra, at *5.

himself for other crimes."[14]  But, in our view, neither the fact that there were other relevant factors contributing to Young's ultimate decision to discharge the appellant, nor the fact that appellant's reticence in group therapy sessions may not have been wholly attributable to a reasonable fear of incriminating himself, necessarily establishes that his discharge from the sex offender treatment program occurred independently of his invocation of the Fifth Amendment privilege.  When an appellate record admits of so strong an inference as this one does that the probationer's unwillingness to incriminate himself was the *deciding* factor in discharging him from the sex offender treatment program, we cannot permit the court of appeals to avoid addressing the constitutional issue.

The trial court found that the appellant violated both conditions thirty and thirty-six of the appellant's conditions of community supervision.  Because a trial court is authorized to revoke community supervision and proceed to adjudication so long as the State has established at least one of the violations it has alleged,[15] the court of appeals limited its review to condition thirty-six, that the appellant must successfully complete the sex offender treatment program, and it thereby avoided the Fifth Amendment issue.  But this approach can work only if the violation upon which the reviewing court relies to uphold the trial court's ruling is itself unquestionably free of constitutional taint.  Before the State may take

[14]
*Id.*

[15]
*See* note 11, *ante.*

advantage of the rule that a revocation may stand on appeal so long as the evidence supports a finding that at least one of the conditions of community supervision was violated, it must demonstrate from the record that the one violation upon which it relies on appeal is supportable *independent* of whatever constitutional taint arguably inheres in the other. If, but for the appellant's invocation of his Fifth Amendment privilege, he would not have been discharged from the sex offender treatment program (condition thirty-six), then his discharge from the program cannot constitute an independent basis for revocation that serves to obviate the reviewing court's obligation to address the constitutionality of revoking him for refusing to submit to incriminating questioning during the sexual history polygraph (condition thirty). The record must show that, even without refusing to answer what he took to be incriminating questions, the appellant actually would have been discharged from the sex offender treatment program. Here, the record does not.

Both Young and Mann insisted that there were "other reasons" for discharging the appellant. But the existence of other factors that were relevant to inform Young's decision is not determinative if the appellant's failure to answer incriminating questions during the polygraph process (or, for that matter, group therapy sessions) was her motivating reason for discharging him. If the other reasons did not, by themselves, cause Young to discharge the appellant from the treatment program, then the fact of his discharge cannot insulate the appellant's revocation from Fifth Amendment scrutiny. Neither Young nor Mann indicated that the "other reasons" supporting Young's decision to discharge the appellant would have

actually caused her to discharge him *regardless* of whether he also refused to implicate himself in prior offenses, either during the polygraph or in therapy; indeed, the record strongly suggests otherwise. Mann acknowledged that, had the appellant only agreed to return to treatment and take the sexual history polygraph, the motion to revoke would have been dismissed. And the ultimatum that is clearly reflected in Young's progress report of June 30th to August 4th of 2009—that the appellant submit to the sexual history polygraph or else be summarily discharged—indicates that the appellant's steadfast refusal to confess to the commission of earlier sex offenses was by far the single most important instance of non-compliance, the *sine qua non*, that informed her decision to expel him from the treatment program.

That the appellant was as reticent to incriminate himself during group therapy meetings (notwithstanding the peer pressure) as he was during the sexual history polygraph process cannot justify his expulsion from the treatment program apart from his claim of Fifth Amendment privilege. Without immunity, he simply may not be forced to confess to criminal behavior in any context, whether during a polygraph examination or during group therapy. It is true, as the court of appeals pointed out, that there were other, non-incriminating disclosures that the appellant refused to make during the group therapy sessions—for example, he refused to admit to fantasizing and indulging in pornography.[16]

---

[16] *Dansby, supra*, at *5.

But Young never suggested that these particular non-disclosures were essential to her decision to discharge him, and they do not rebut the strong inference from the record that it was specifically the appellant's intransigence with respect to admitting to prior criminal offenses that actually provoked her action. In the absence of testimony that Young would have discharged the appellant for these deficiencies alone, quite apart from his failure also to incriminate himself, the State has not established that his discharge presented a sufficient basis to proceed to adjudication that was wholly independent of his claim of Fifth Amendment privilege.[17] Under these circumstances, the court of appeals erred to believe it

---

[17]

The dissent opens with the assertion that we are simply acting on our "belief" that Young discharged the appellant "solely because" of his invocation of his Fifth Amendment privilege. Dissenting Opinion at 1. The balance of the dissent accuses us of indulging in inappropriate fact-finding, encroaching upon the trial judge's prerogative to resolve issues of historical fact and credibility as he sees fit based upon the evidence. We reject these assertions. We do not doubt the credibility of Young and Mann, nor do we ignore their testimony that, as a matter of historical fact, "other reasons" contributed to the decision to discharge the appellant from the treatment program, causing him to violate condition thirty-six of deferred adjudication community supervision. We hold, instead, that those facts alone are not definitive. Neither Young nor Mann was asked, and the record does not otherwise establish, whether—as a matter of historical fact—those other reasons would have caused Young to discharge the appellant from the program *even had he submitted to the sexual history polygraph.* It is this question of historical fact that determines whether revoking the appellant's community supervision was accomplished independently of his invocation of the Fifth Amendment privilege. In the absence of an answer to this definitive question on the record, the trial court may not, in the name of "discretion," speculate that Young would have discharged the appellant from the treatment program for the "other reasons" she mentioned, even if he had taken the polygraph. What we hold today is that, as beneficiary of the appellate rule that, upon proof of the violation of any one condition of probation, an appellate court may affirm a revocation order, the State bears the burden of producing a record that demonstrates an absence of constitutional infirmity in the one condition upon which it would rely. We do not purport to find as a matter of historical fact that, but for the appellant's failure to take the sexual history polygraph, Young would not have discharged him from the sex offender treatment program. Rather, we hold as a matter of law that the State has failed to satisfy its burden to show *otherwise.*

could eschew the constitutional issue on direct appeal.

## CONCLUSION

Accordingly, we reverse the judgment of the court of appeals and remand the cause for further appellate consideration consistent with this opinion.[18]

DELIVERED:     May 8, 2013
PUBLISH

---

[18] The State has devoted a substantial portion of its brief in reply to the appellant's petition for discretionary review to the argument that, by failing to object to any of the conditions of deferred adjudication community supervision at the time they were imposed, or at any reasonable time thereafter, the appellant has forfeited, or should be estopped from asserting, his Fifth Amendment privilege on appeal. The court of appeals did not have to address this argument on original submission, however, and neither shall we reach it for the first time on discretionary review, leaving it to the court of appeals to resolve, if necessary, on remand.



# IN THE COURT OF CRIMINAL APPEALS
## OF TEXAS

### NO. PD-0613-12

**MICHAEL EDWARD DANSBY, SR, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIFTH COURT OF APPEALS
### KAUFMAN COUNTY

KEASLER, J., filed a dissenting opinion, in which KELLER, P.J., and HERVEY, J., joined.

## OPINION

The linchpin of the Court's opinion is its belief that Linda Young, Michael Dansby's therapist, discharged Dansby solely because he refused to submit to a sexual-history polygraph examination required for probationers in her sex-offender treatment program. It is apparent that this belief drives the Court's analysis and the case's final outcome. And to stretch this belief into a rationale why the court of appeals erred in failing to review Danby's constitutional claim, the Court holds that the lower court could not rely on the legal principle

that a single violation proved by a preponderance of the evidence is sufficient to proceed to judgment, "if one ground for revocation that it found to be supported by the evidence is equally infected with constitutional infirmity as the ground for revocation [the lower court did not reach]."[1] Using its newly minted "constitutional infection theory," the Court recasts the issue before it as a question of whether Dansby's refusal was the true reason for his discharge; a question the Court is too willing to answer.

Two central issues prevent me from joining the Court's opinion: First, the Court's rationale falsely assumes, without the necessary analysis or authority, that the therapist's subjective intent in discharging Dansby is relevant and is the appropriate analysis of whether the court of appeals should have reviewed Dansby's constitutional-violation claim. Second, the Court takes it upon itself to make a factual finding that it is ill-suited to make and reaches a conclusion that is contrary to the record.

The Court crafts an unnecessary rule that requires lower courts, in evaluating whether a trial court has abused its discretion in revoking community supervision, to plumb the depths of a therapist's subjective intent in choosing to discharge a probationer from treatment. The Court concludes that, the other factors contributing to Young's decision to discharge, including Dansby's reluctance to participate in group sessions divorced from fear of self-incrimination, do not necessarily establish that his discharge was for a reason independent

---

[1] *Ante*, op. at 13–14.

from his Fifth Amendment assertion.[2]

The Court misses the mark because it conflates the issues of whether Young inappropriately discharged Dansby with whether the trial court abused its discretion.[3] In my view, the court of appeals correctly analyzed the true issue—whether the trial court abused its discretion. On direct appeal, Dansby framed the relevant issue as whether the trial court abused its discretion in finding that Dansby violated conditions thirty (requiring that he submit to polygraph examinations) and thirty-six (requiring successful completion of sex-offender treatment). The court of appeals resolved the case by "conclud[ing] the trial court could have held a reasonable belief that [Dansby] violated condition thirty-six for reasons other than invoking his Fifth Amendment privilege" and therefore did not need to address his issue relating to condition thirty.[4]

While Young's decision to discharge Dansby triggered the motion to adjudicate, it is the trial judge alone who decides whether Dansby violated the terms of community supervision alleged in the motion to adjudicate.[5] Young's discharging Dansby from treatment does not mean that the trial judge had to revoke Dansby's community supervision.

---

[2] *Ante*, op. at 15.

[3] *See generally Leonard v. State*, 385 S.W.3d 570, 584–85 (Tex. Crim. App. 2012) (Keasler, J., dissenting).

[4] *Dansby v. State*, No. 05-10-00866-CR, 2012 WL 1150530, *5 (Tex. App.—Dallas April 9, 2012) (not designated for publication).

[5] TEX. CODE CRIM. PROC. art. 42.12, § 10(a).

The allegation was simply that Dansby did not successfully complete sex-offender treatment. In the abstract, there could be an infinite number of potential reasons why a probationer was not complying with treatment, each one sufficient to support a therapist's decision to discharge a probationer and a judge's decision to revoke or adjudicate. At the motion-to-adjudicate hearing, Dansby was given an opportunity to justify the alleged reason for discharge and in fact argued the same issue he does here, that he was discharged solely as a result of his Fifth Amendment invocation. Young's testimony refuted this assertion. The trial judge is "the sole trier of facts, of the credibility of the witnesses, and of the weight to be given to particular testimony at the hearing" and can accord varying weight to a witness's testimony or completely disregard it.[6] We have long held that an abuse-of-discretion standard applies when reviewing a trial judge's revocation of probation.[7] A trial court abuses its discretion by revoking probation when the State has failed to prove a violation by a preponderance of the evidence.[8]

As the Court insists, the State now has the burden to "establish" in the record that, in response to a hypothetical question that calls for speculation, the therapist would have discharged a probationer solely on other grounds if the probationer merely claims his

---

[6] See Naquin v. State, 607 S.W.2d 583, 586 (Tex. Crim. App. 1980).

[7] Hacker v. State, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013); Rickels v. State, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006); Cardona v. State, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984); Caddell v. State, 605 S.W.2d 275, 277 (Tex. Crim. App. 1980).

[8] Cardona, 665 S.W.2d at 493–94.

discharge was the result of invoking the Fifth Amendment privilege. The more logical rule is that if the discharge is proven by a preponderance of the evidence and the record supports a finding that other legitimate grounds for discharge existed, any one of which would alone objectively justify discharging the probationer from treatment, the trial court's revocation and adjudication should be upheld. The court of appeals was correct in so holding and a prudent appellate court will only address those claims that are dispositive of the issues before it. Discussed in more detail below, even putting aside Dansby's refusal, there were several alternative reasons for discharging Dansby independent of his Fifth Amendment invocation and non-compliance motivated by fear of self-incrimination.

A majority of the Court definitively concludes that Dansby's refusal to submit to a sexual-history polygraph examination out of fear that he might incriminate himself was the deciding factor in Young's decision to discharge Dansby. How can we, sitting as a discretionary review court, review a cold record in this context—devoid of mannerism, body language, inflection, and all other nuance observable only by a trial judge—and confidently conclude that Young's decision to discharge Dansby was so transparently motivated by his failure to submit to a sexual-history polygraph examination? We have clearly recognized the superiority of a trial judge's position in determining issues of fact and credibility and recognized our own limitations in this respect.[9] These "'Johnny[s]-on-the-Spot'" [are]

---

[9] *State v. Mendoza*, 365 S.W.3d 666, 669–70 (Tex. Crim. App. 2012).

personally able to see and hear the witnesses testify."[10] Instead, we are left with testimony and evidence presented only in its written form, and yet from this, the Court derives Young's subjective intent. To pretend that we are capable of rendering such a conclusion in this context is foolhardy. Despite our limitations in making these determinations in this type of case, I can only suppose this Court wishes to usurp the trial judge's once-exclusive role as arbiter of witness credibility.

Moreover, the majority reaches this factual finding despite testimony to the contrary and makes an inherent finding that Young is not credible. Young was asked a total of three separate times, by both the State and Dansby, whether Danby's refusal to take the sexual-history polygraph examination was the only reason he was discharged from the program. Each time, she stated that it was not:

> Q:   Was the not taking the polygraph was that the only reason that he got thrown out of sex offender treatment?
>
> A:   No, it's not at all. He couldn't participate because he would of had to disclose information, and he was unwilling to do that. So, he was guarded and his participation was not on target in terms of his own issues, his attitude stunk there at the end, and he just wasn't getting anywhere.
>
> . . . .
>
> Q:   Okay. And based on [Dansby's refusal to answer any questions concerning prior sexual conduct], he was excused from your counseling sessions; is that correct?

---

[10] *Id.* at 669.

A:     That's not correct.

. . . . .

Q:     So, was the sex offender polygraph was that the only reason he got thrown out of treatment; he was just doing great otherwise?

A:     No, not at all.

In addition to her concerns and opinions about the course of Dansby's treatment and ultimate progress, Young testified about Dansby's other behavior and failings that could constitute other grounds for discharge. Among them, Dansby (1) had minimal or no improvement during his year in treatment, (2) "never fully developed underlying beliefs—didn't let himself be vulnerable enough to give us that kind of information," (3) had an inability to admit or self-report about sexual impulses, the use of pornography, or having fantasies, (4) was being manipulative through lying and conning, (5) did not understand that he was a risk based on his deviant sexual desire and personality disorder, (6) failed to participate in group sessions by "refus[ing] to talk" when asked questions, and, (7) as a result of his lack of participation in group sessions, was disruptive. Each one of these examples of Dansby's non-compliance is sufficient to support the trial judge's finding of true that Dansby unsuccessfully completed sex-offender treatment.

I agree with the Court that some evidence may suggest Dansby's refusal to take a sexual-history polygraph examination could have been one among many factors considered in deciding to discharge Dansby from treatment. However, I disagree with the Court's conclusion that, even if we should wade into the fact-finding waters, the evidence rises to the

level to forcefully establish that Young discharged Dansby for this reason alone. Even evaluating this evidence favorably to the Court's opinion, it depicts an ambiguous record at best when compared to the other evidence of Dansby's non-compliance.

Lastly, although the Court expressly abstains from addressing whether Dansby's claim of the Fifth Amendment privilege was legitimate, the Court inherently presumes that it is. To be given any force, the Court's new rule must be understood to presume that Dansby's Fifth Amendment assertion is valid. This is so because the Court articulates the new rule and the State's burden by incorporating the phrases "even without refusing to answer what he took to be incriminating" and "wholly independent of his claim of Fifth Amendment privilege."[11] Surely, the Court cannot be understood to put the State to this heightened burden upon a probationer's mere claim of a constitutional violation whether substantiated or not. Here, if Dansby's reliance on the Fifth Amendment privilege is misplaced, there would be no constitutional violation for revoking him solely for refusing to answer questions about his sexual history, and therefore no other grounds for revocation to be "infected."

For these reasons, I dissent.

DATE FILED: May 8, 2013

PUBLISH

---

[11] *Compare ante*, op. at 16 *with* op. at 18.