

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-21-00116-CV

_____

IN THE INTEREST OF S.A.W., A CHILD

On Appeal from the County Court at Law
Panola County, Texas
Trial Court No. 2020-343

Before Morriss, C.J., Stevens and Carter,* JJ.
Memorandum Opinion by Chief Justice Morriss

_____

*Jack Carter, Justice, Retired, Sitting by Assignment

MEMORANDUM OPINION

Father appeals the termination of his parental rights to S.A.W.[1] Though Mother's parental rights to S.A.W. were also terminated, she does not appeal that result.

When Mother, who suffered from both mental deficiencies and mental illness, unexpectedly went into labor on the front porch of her small trailer,[2] Father coaxed her into the front yard where he delivered the baby, S.A.W. After he clamped and cut the umbilical cord, Father wrapped S.A.W. in what he described as a clean blanket,[3] laid S.A.W. on the floor of the small trailer near a portable heater, covered Mother with several blankets, and left Mother on the ground in the yard. Mother and S.A.W. remained in these locations until emergency medical technicians (EMTs) arrived about two hours later and transported them to Good Shepherd Hospital in Longview. While Mother and S.A.W. were in the hospital, a referral was made to the Child Protective Services (CPS) Division of the Texas Department of Protective and Family Services (the Department), which, after a short investigation, determined that Mother could not properly care for the child, that she did not have an appropriate place to live with the child, and that S.A.W. needed to be placed into the Department's conservatorship.

---

[1]We refer to the child by her initials, her birth parents as Mother and Father, and her other relatives by pseudonyms. *See* TEX. R. APP. P. 9.8.

[2]On the property where Mother and Father resided there was a larger trailer where Mother's stepbrother, Jack, resided, and a smaller trailer where Mother and Father resided. At trial, the smaller trailer was variously referred to as a camper, the small trailer, the little trailer, and a "fifth wheel." We will refer to the trailer where Mother and Father resided as the "small trailer" and to the trailer where Jack resided as the "large trailer."

[3]Reports in evidence from medical personnel on the scene after the birth indicated that the baby was wrapped in a dirty towel.

About one year after S.A.W. was removed, the trial court determined that termination of Mother's and Father's parental rights was in the best interest of S.A.W., terminated Mother's parental rights because she had a mental or emotional illness or mental deficiency that rendered her unable to provide for the needs of the child,[4] and terminated Father's parental rights on the three grounds set out in Section 161.001(b)(1), subsections (D), (E), and (O), of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O) (Supp.).

On appeal, Father asserts that the evidence is legally and factually insufficient to support the trial court's findings on the statutory grounds and that the evidence is factually insufficient to support its finding that termination of his parental rights was in the child's best interest. Because (1) sufficient evidence supports the ground E finding and (2) factually sufficient evidence supports the best-interest finding, we affirm the trial court's judgment.

"The natural right existing between parents and their children is of constitutional dimensions." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). This Court is required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *Id.* (quoting *In re A.B.*, 437 S.W.3d at 500).

---

[4]*See* TEX. FAM. CODE ANN. § 161.003(a) (Supp.).

"[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing TEX. FAM. CODE ANN. § 161.001 (Supp.); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007) (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009)). "This standard of proof necessarily affects our review of the evidence." *Id.*

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *In re J.P.B.*, 180 S.W.3d at 573).

4

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine 'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id.* (quoting *In re H.R.M.*, 209 S.W.3d at 108 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002))); *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). "'[I]n making this determination,' we undertake 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'" *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (quoting *In re C.H.*, 89 S.W.3d at 26)). "We also recognize that the trial court, as the fact-finder, is the sole arbiter of a witness' demeanor and credibility, and it may believe all, part, or none of a witness' testimony." *In re A.M.*, No. 06-18-00012-CV, 2018 WL 3077784, at *3 (Tex. App.—Texarkana June 22, 2018, pet. denied) (citing *In re H.R.M.*, 209 S.W.3d at 109).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, 'the rights of natural parents are not absolute; protection of the child is paramount.'" *In re L.E.S.*, 471 S.W.3d at 920 (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994))) (citing *In re M.S.*, 115 S.W.3d

5

534, 547 (Tex. 2003)).  "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights."  *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.— Texarkana 2015, no pet.) (citing *In re C.H.*, 89 S.W.3d at 26)).

*(1)      Sufficient Evidence Supports the Ground E Finding*

In his first issue, Father asserts that the evidence is legally and factually insufficient to support the trial court's findings under grounds D, E, and O.  "Only one predicate finding under Section 161.001[b](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest."  *Id.* at 923 (quoting *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied) (quoting *In re A.V.*, 113 S.W.3d at 362) (citing *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.))).  Even so, when the trial courts findings under grounds D or E are challenged on appeal, due process demands that we review the evidence supporting the findings under at least one of those grounds when they are challenged on appeal.  *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) ("We hold that due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights under Section 161.001(b)(1)(D) or (E) of the Family Code.").  This is because termination of parental rights under these grounds may implicate the parent's parental rights to other children.  *Id.* at 234; *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(M) (providing as a ground for termination of parental rights that the parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E).").

6

Ground E permits the termination of a parent's parental rights "if the court finds by clear and convincing evidence[] that the parent has . . . engaged in conduct . . . which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Endanger "means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment." *In re E.N.C.*, 384 S.W.3d at 803. "'Endanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re L.E.S.*, 471 S.W.3d at 923; *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.). "It is not necessary that the conduct be directed at the child or that the child actually suffer injury." *In re L.E.S.*, 471 S.W.3d at 923. "Under subsection (E), it is sufficient that the child's well-being is jeopardized or exposed to loss or injury." *Id.* (citing *Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 367). "Further, termination under subsection (E) must be based on more than a single act or omission. Instead, a 'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.))); *see Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 366–67.

"[Subsection E] refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act." *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied); *see In re N.S.G.*, 235 S.W.3d at 366–67. "The conduct to be examined includes what the parent did both before and after the child was born." *Id.* at 902; *see In re N.S.G.*, 235 S.W.3d at 367. The endangering conduct may also occur "either before or after

7

the child's removal by the Department." *In re Z.J.*, No. 02-19-00118-CV, 2019 WL 6205252, at *11 (Tex. App.—Fort Worth Nov. 21, 2019, pet. denied) (mem. op.) (citing *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)). Failing to provide appropriate medical care for a child may also be endangering conduct. *See In re H.M.O.L.*, Nos. 01-17-00775-CV, 01-17-00776-CV, 2018 WL 1659981, at *13 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied) (mem. op.); *In re S.G.F.*, No. 14-16-00716-CV, 2017 WL 924541, at *6 (Tex. App.—Houston [14th Dist.] Mar. 7, 2017, no pet.) (mem. op.); *In re D.V.*, 480 S.W.3d 591, 601 (Tex. App.—El Paso 2015, no pet.). In our analysis under ground E, we may also consider a parent's failure to complete relevant requirements of his service plan. *In re Z.J.*, 2019 WL 6205252, at *11; *In re U.H.R.*, No. 07-18-00318-CV, 2019 WL 81874, at *5 (Tex. App.—Amarillo Jan. 2, 2019, no pet.) (mem. op.).

The evidence relevant to the trial court's finding under ground E showed that Mother had undergone a psychological assessment by a clinical psychologist, Donald E. Winsted, III, who testified that Mother's verbal intelligence tested in the one percent range (meaning 99% of people in her age range tested at or above her), her non-verbal IQ tested at less than 0.1 percent, and her full-scale IQ tested at 0.1 percent, which placed her in the mentally deficient range. He also testified that people with Mother's IQ function on a third- to fourth-grade level. In addition to her mental deficiencies, Winsted's diagnostic impressions were that Mother suffered from trauma related borderline personality disorder with antisocial, dependent, histrionic, schizoid, and schizotypal personality traits and depressive, sadistic, passive-aggressive and self-defeating features.

From Father's testimony, it appears that he met Mother about two years before S.A.W. was born and had been with Mother for fifteen months before the child's birth. Although he recognized that Mother and her stepbrother Jack had some disabilities and that Mother was schizophrenic, Father maintained that both of them were not as deficient as people thought. He also testified that at the time Mother was not on medication but that he got her anti-psychotic medicine reinstated.

Father testified that he fell in love with Mother and that they decided to be married[5] and have a family. Although Father testified that he knew for a long time that Mother was pregnant and that he told her all along that she was pregnant, he also testified that Mother believed it only after they had gone to the Wellness Center about three weeks before the birth and a doctor had told her. Father maintained that he had tried to get Mother to get medical help after he found out she was pregnant, but that she would not. Nevertheless, after the birth of S.A.W., Mother told CPS investigator Kaila Rountree that she did not know she was pregnant until the baby's birth was imminent.

On the morning S.A.W. was born, Father went to the large trailer to use a microwave to cook Mother breakfast. When he returned to the small trailer, Mother was sitting on the front porch, and Father asked if the cause for her sitting there was the baby. Mother told him to leave her alone and refused to go inside, so Father got several horse blankets,[6] put them on the ground, and coaxed Mother to lie on them. He got five more blankets to lay on top of her and began

---

[5]Apparently, Father maintained that they had an informal marriage, since there was no evidence of a ceremonial marriage.

[6]S.A.W. was born November 1, 2020, when, Father testified, it was freezing cold.

9

doing Lamaze actions; according to Father, the baby was born quickly. After he cut and clamped the umbilical cord, Father took the baby inside, wrapped it in a blanket, and laid the baby on a pallet by a heater. He went back outside and asked Mother to come inside, but she declined and said her tummy was hurting.

Apparently, someone had called 9-1-1, because a highway patrolman and three deputies arrived while Mother was still outside. Father told them that everything was okay and there was no emergency. When they told him an ambulance was coming, he told them to have it turn around because there was no emergency and that he would transport them himself. Nevertheless, an ambulance arrived at the scene. Although Father maintained that the officers arrived about twenty minutes after onset of labor, the EMT's report recited that the law enforcement officers reported that one of the neighbors had called them because Mother had given birth two hours before and was still sitting on the ground screaming for help. Father also maintained that the birth only took fifteen minutes and that, because of the rapidity of the labor, he did not have time to call for emergency services.

The EMTs examined both Mother and S.A.W. In his report, one EMT described what he saw when he walked into the small trailer:

> [T]he entire right side of the [small trailer] is full of trash almost up to the ceiling and smells awful and is disgusting[.] [T]hey have no bed or furniture[.] [T]here is a small sheet that [Father] pulls back where the new baby is laying on the ground wrapped in a dirty towel next to a heater and has been in there by it[]self for at least 40 mins . . . . [T]he baby has not fed in the two hours and the mother tells us we can take the baby but she does not really want to go to the hospital[.] [B]ut the mother is extremely confused and we are told she is bipolar and schizophrenic[.] I then pick up the baby and make sure that it is doing ok[.]

[W]hen simulated (sic) it makes a big cry and is pink acting like a healthy newborn[.] I check the umbilical[,] it is proper (sic) clamped off.[7]

The report of the EMT who examined Mother stated:

> The patient had been having back pain so they went to see the doctor a week prior and the dr told them that she was pregnant, but they didn't believe her till she started to bleed today and she thought she was having a period[.] [B]ut they laid her down on the ground outside after her water broke and then she had the[] baby[.] [T]he man she was staying with then clamped the umbilical cord on both sides and cut it in the middle and brought the baby inside the [small trailer] and laid it down on the ground of the [small trailer] wrapped in a towel near the heater[.] [T]hat was 2 hours ago and the patient has been laying on the ground outside the whole time covered up by a dirty blanket and the neighbors called 911. Pt was confused on scene. Pt was disoriented to her current age, the current year, the current president, and the current city she is in. Pt stated she thought she was in Houston [T]exas. When asked how many previous pregnancies/births she has had she gave several different answers and cannot explain how many children she has. Pt kept saying currently born baby was a boy even after EMS told her the baby was a girl.

The report also stated that Mother had feces and blood all over her, that she had already passed the placenta and palm sized blood clots, but that she was very minimally bleeding. Both Mother and S.A.W. were transported to Good Shepherd Hospital in Longview.

On that same day, the Department received an intake on Mother, Father, and S.A.W. The next day, Rountree tried to interview Mother at the hospital, but Father would talk over her and answer for her. Mother told Rountree that she was bipolar and schizophrenic but was not on her medications. Kerry Trull, the CPS caseworker assigned to the case, testified that, for most of the case, Mother had voluntarily been at a location where she was supervised.[8] Mother told Trull

---

[7]Father attributed the smell to Jack's end of the small trailer, maintained that the EMT lied about S.A.W. being wrapped in a dirty towel, and testified that he was "called a clean freak and germ freak."

[8]A few days after giving birth to S.A.W., Mother was moved to a psychiatric hospital, and then to a residential home in another county.

that she did not know she was pregnant and did not know how she got pregnant. Trull testified that, at times, Mother had identified Father as S.A.W.'s father and, at other times, had said that S.A.W. did not have a father.

While in the hospital, Mother told Rountree that her home did not have electricity or water and that the smell was pretty bad. She also told Rountree that she did not think S.A.W. should leave the hospital and that she would do better with the doctors and nurses. Rountree went to inspect the small trailer, where she took twenty-three photographs that were admitted into evidence. Father told her that the small trailer was going to be their primary residence. In addition, she took five photographs at the large trailer because Father told her that was where they used the restroom. Rountree testified that neither trailer was a safe environment for a child.

Father had lived with Mother in the small trailer for months before S.A.W. was born. Father testified that several months after he met Mother, Mother's father, Chuck, invited Father to move on to the property where they were living. The large trailer, where Chuck lived at the time, and the small trailer, where Mother and Jack lived, were both on the property. When Father moved into the small trailer with Mother and Jack, he helped fix the roof and some holes in the floor.

At some point, Chuck moved out of the large trailer, Jack moved into it, and Father sealed off the bedroom and bathroom of the small trailer where Jack had been living. Father told Sharlytt Asher, the CASA[9] volunteer appointed to the case, that he sealed that area off because there were different areas that had feces on them, and he boarded it up to get rid of the smell.

_____

[9]Court Appointed Special Advocate.

Father also testified that there was mice feces in everything they owned. He also testified that when he moved into the trailer, Mother was wetting and defecating herself sometimes. Although he maintained that he cleaned the small trailer when he moved in, when Asher viewed the trailer about a month after Mother no longer lived there[10] and observed feces smeared on the wall in the area that had been occupied by Mother and Father, Father told her it was because Mother sometimes had trouble. Asher also noted that the small trailer had a smell to it and that the cabinets had tape all over them. There was an air mattress on the floor with sheets and moving blankets. Father said he slept on the mattress and that Mother slept on the floor.

Father also told Asher that he knew that neither the small trailer nor the large trailer was a proper place for S.A.W. and took her down the road to show her a camper that he said he was going to borrow until he could find an apartment. A little over two months later, after Father's paternity had been established, the trial court entered orders approving and adopting his plan of service as an order of the court. The plan of service required, *inter alia*, that Father demonstrate to the Department that he could provide a safe, clean, and stable living environment for S.A.W. Nevertheless, the evidence showed that although Father represented to Trull and Asher[11] that he was planning on getting an apartment, he continued to live in either the small trailer or the large trailer for the entire year the case was pending.

Asher examined the small trailer again three months after the case began because Father was still living there. She testified that it was significantly worse than it was on her first visit.

---

[10]Mother did not return to the property after S.A.W.'s birth.

[11]At trial, Father again asserted that he would get an apartment if S.A.W. were returned to him.

She talked with Father about the small trailer, and he informed her that he was going to fix up the large trailer and that was where he would reside with S.A.W.

Four months later, Father represented to the trial court that he was ready for a home assessment, and Asher and Trull separately returned to the property to assess the large trailer. Asher identified a number of safety issues that made that trailer unsafe for a small child: ceilings held together with duct tape that appeared to be collapsing; no doors on the kitchen cabinets with debris and animal feces in the cabinets; no stove; water at the kitchen sink coming out of a plastic tube with a bucket under the sink to catch water; no refrigerator; no food other than outdated cans and lots of syrup; and the master bedroom being the only room that had furniture, heat, or air. Trull observed the same issues when she assessed the large trailer and, in addition, noted that there was mold on the ceiling, hazardous electrical outlets, and exposed electrical wires taped to the ceiling. Photographs taken by Trull on her visit confirmed Asher's and Trull's testimony.

Asher also testified that she had a deputy sheriff accompany her when she went to the large trailer for the home assessment. She explained that her relationship with Father had deteriorated after she testified in court that Mother told her that Father had hit her. Later that day, Father texted her that she was going to regret what she had said in court. She also received more texts from Father, so she felt it necessary to take the deputy with her. Trull testified that Father's visitation with S.A.W. took place at the Henderson CPS office and that security was always present because Father made numerous threats and veiled threats.

14

Father's plan of service also required him to provide the Department with proof of his income, take parenting classes, submit to a psychological evaluation and follow all recommendations, participate in individual counseling, and maintain appropriate behavior. After his psychological evaluation, he was also required to take one-on-one parenting classes, psychiatric testing reevaluation by Dr. Winsted, and anger management classes. Trull attempted to discuss these requirements with Father once a month, but he insisted that he did not need the services. Although Father completed the initial parenting classes, Trull testified that he had not demonstrated what he learned; struggled with feeding, dressing and undressing S.A.W.; and struggled with changing her diaper. When asked what he learned in the parenting classes, Father testified that he had children who were grown and that he had no need to learn anything. Trull also testified that Father had not provided proof of income, had not demonstrated an ability to keep S.A.W. safe, and had not worked any of his other services.

Although Father sought to characterize his relationship with Mother as one in which he loved and cared for her and had rescued her from mistreatment by her father, the evidence supported a finding that the relationship was one in which he abused and neglected the needs of Mother, a person with a disability and one about three decades his junior. As applicable to this case, "'[p]erson with a disability' means a person with a mental, physical, or intellectual or developmental disability that substantially impairs the person's ability to provide adequately for the person's care or protection and who is . . . 18 years of age or older." TEX. HUMAN RES. CODE ANN. § 48.002(8)(A). "Abuse" can mean either "the negligent or willful infliction of injury . . . with resulting physical or emotional harm or pain to . . . [a] person with a disability by the

15

person's caretaker, family member, or other individual who has an ongoing relationship with the person," or "sexual abuse of . . . [a] person with a disability . . . committed by the person's caretaker, family member, or other individual who has an ongoing relationship with the person." TEX. HUMAN RES. CODE ANN. § 48.002(2). "Neglect" includes the failure of a caretaker to provide "the goods or services, including medical services, which are necessary to avoid physical or emotional harm or pain." TEX. HUMAN RES. CODE ANN. § 48.002(4).

The evidence showed that Father had an ongoing relationship with Mother and was her self-proclaimed caretaker and that Mother suffered from mental and intellectual disabilities that substantially impaired her ability to adequately provide for her care and protection. Although Father characterized the decision to have a baby (and, necessarily, to engage in sexual intercourse) as mutual and consensual, other evidence showed that Mother did not know she was pregnant or how she got pregnant and that the decision was neither mutual nor consensual. In addition, although Father knew that Mother was pregnant, he continued to have her sleep on the floor of a small trailer with feces on the walls, and he failed to ensure that she received adequate pre-natal medical care, which endangered both Mother and S.A.W. Further, Father failed to call emergency services when Mother began to go into labor, choosing instead to deliver the baby himself without medical assistance or backup. Even if Father's testimony that the baby was born fifteen minutes after the onset of labor were believed, Father allowed Mother to lie outside in dirty blankets on a cold morning for over two hours and wrapped S.A.W. in a dirty towel and laid her inside the unsanitary trailer for two hours without cleaning Mother and without seeking

16

medical treatment for either of them. Then, when sheriff's deputies arrived two hours after the birth and told him EMTs were on the way, Father told them to tell the EMTs not to come.

The trial court could consider Father's history of abuse and neglect of Mother before and during her pregnancy for the purposes of ground E. *See In re Z.M.*, 456 S.W.3d 677, 686 (Tex. App.—Texarkana 2015, no pet.). This abusive and neglectful conduct, which endangered both Mother and S.A.W. during the pregnancy, was continued both during and immediately after the birth of S.A.W. and while the case was pending. Although Father continually represented that he would rent an apartment, the only homes that he offered for S.A.W. during the case were the small and large trailers, both of which were unsanitary and presented other unacceptable safety issues. In addition, Father failed to demonstrate that he learned any parenting skills from the initial parenting classes and failed to participate in one-on-one parenting sessions, individual counseling, and further psychiatric evaluation, all of which were designed to correct his endangering conduct. The trial court could also consider these omissions by Father for the purposes of ground E.

Based on this record, we find that legally and factually sufficient evidence supported the trial court's finding under ground E. Since there was sufficient evidence supporting the trial court's finding under ground E, we need not review its findings under grounds D and O. *J.T. v. Tex. Dep't of Family and Protective Servs.*, No. 03-21-00070-CV, 2021 WL 2672055, at *9 (Tex. App.—Austin June 30, 2021, no pet.) (mem. op.); *In re M.F.*, No. 14-19-00964-CV, 2020 WL 2832166, at *8 (Tex. App.—Houston [14th Dist.] May 28, 2020, pet. denied) (mem. op.). We overrule Father's first issue.

17

*(2)     Factually Sufficient Evidence Supports the Best-Interest Finding*

Father also challenges the factual sufficiency of the evidence supporting the trial court's finding that termination of his parental rights was in the best interest of S.A.W.  Father points to the evidence that he delivered the child and wrapped it in a towel to keep it warm, that he took parenting classes and visited the child, that he was distraught over the removal of the child, that he paid for the paternity test, and that there was no evidence of substance abuse.  However, even if this evidence would not support a best interest finding, it is not so significant that the trial court could not, in light of the entire record, have reasonably formed a firm belief or conviction that termination was in the child's best interest.  *See In re J.F.C.*, 96 S.W.3d at 266.

"There is a strong presumption that keeping a child with a parent is in the child's best interest."  *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)).  "Termination 'can never be justified without the most solid and substantial reasons.'"  *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

In determining the best interests of the child, courts consider the following *Holley* factors:

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

18

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *In re C.H.*, 89 S.W.3d at 28.

S.A.W. was only one year old at the time of trial, so she was too young to verbalize her desires. However, since S.A.W. was about three months old, she had been placed with her half-sister, Ann, and Ann's family. Asher testified that S.A.W. was very bonded and attached to Ann and that, when Ann left the room, S.A.W. became distraught. She also testified that Ann had other children who considered S.A.W. their baby sister. From this evidence, the trial court could infer that S.A.W. would prefer to stay with Ann's family. *See In re B.H.R.*, 535 S.W.3d 114, 123 (Tex. App.—Texarkana 2017, no pet.); *In re K.O.*, 488 S.W.3d 829, 840 (Tex. App.—Texarkana 2016, pet. denied). This factor weighs in favor of termination.

The evidence also showed that Ann and her husband gave up two other foster children previously placed with them in order to care for S.A.W. While in their care, S.A.W. had begun to walk, talk, make hand signals, and call Ann "Mama" and Ann's husband "Da-Da." In addition, Ann and her husband had cousins, grandparents, aunts, and uncles in the area. As seen above, Father's conduct before, during, and after the birth of S.A.W. endangered the physical and emotional well-being of S.A.W. Further, from his resistance to and failure to take advantage of the services available to him, and his failure to make efforts to provide S.A.W. with a suitable and safe living environment, the trial court could infer that Father's acts and omissions would continue to endanger S.A.W. in the future. From this evidence, the trial court could conclude

19

that Ann and her husband had met and would continue to meet the emotional and physical needs of the child and that Father presented and would continue to present an emotional and physical danger to the child. The trial court could also conclude that, since Father failed to take advantage of the services made available to him, he would also fail to use any services available to him should S.A.W. be returned to him. Therefore, the second, third, fifth, and seventh *Holley* factors weigh heavily in favor of termination.

S.A.W. was thriving under Ann's care, and Ann and her husband planned to adopt her. The evidence also showed that S.A.W. was developing normally under their care. Although Father consistently attended his visitations with S.A.W., he showed an inability to tend to her basic needs and resisted assistance when it was offered. He also resisted taking advantage of the services that would help him become a better parent and insisted that he did not need them. From this evidence, the trial court could conclude that the fourth, sixth, and eight *Holley* factors also weighed in favor of termination.

Based on this record, a fact-finder reasonably could have formed a firm belief or conviction that termination of Father's parental rights was in S.A.W.'s best interest. As a result, we find that factually sufficient evidence supported the trial court's best-interest finding. We overrule this issue.

For the reasons stated, we affirm the trial court's judgment.

Josh R. Morriss III
Chief Justice

Date Submitted:     April 11, 2022
Date Decided:       April 22, 2022