

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00527-CV

**IN RE COMMITMENT OF** Sammy **YBARRA**

From the 186th Judicial District Court, Bexar County, Texas
Trial Court No. 2021CI01455
Honorable Jefferson Moore, Judge Presiding

Opinion by:     Liza A. Rodriguez, Justice

Sitting:         Rebeca C. Martinez, Chief Justice
                 Patricia O. Alvarez, Justice
                 Liza A. Rodriguez, Justice

Delivered and Filed: January 17, 2024

AFFIRMED

After a jury trial, Sammy Ybarra was found to be a sexually violent predator and was civilly committed for sex-offender treatment and supervision. He brings three issues on appeal: (1) whether the evidence is factually sufficient to support the jury's finding that he is a sexually violent predator; (2) whether the trial court abused its discretion in admitting evidence of unadjudicated sexual offenses over his objection pursuant to Texas Rule of Evidence 403; (3) whether the trial court abused its discretion in compelling him to answer questions even though he had invoked his right against self-incrimination. We affirm the trial court's judgment and order of commitment.

### FACTUAL SUFFICIENCY OF THE EVIDENCE

A jury unanimously determined beyond a reasonable doubt that Sammy Ybarra is a sexually violent predator pursuant to the Sexually Violent Predators Act ("SVP Act"). *See* TEX.

HEALTH & SAFETY CODE §§ 841.001-.153. In conformity with the verdict, the trial court civilly committed him. On appeal, Ybarra argues the evidence is factually insufficient to support a finding beyond a reasonable doubt that he has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.

"The appellate standard governing a factual-sufficiency review of a finding that a person is a sexually violent predator is whether, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of the verdict, along with undisputed facts contrary to the verdict, is so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met." *In re Commitment of Stoddard*, 619 S.W.3d 665, 678 (Tex. 2020). "In doing so, the appellate court may not usurp the jury's role of determining the credibility of witnesses and the weight to be given their testimony, and the court must presume that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so." *Id*. at 668.

To establish that an individual is a sexually violent predator, the State must prove that the individual: (1) is a repeat sexually violent offender; and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence. TEX. HEALTH & SAFETY CODE § 841.003(a). Under the first element, a person is a "repeat sexually violent offender" if "the person is convicted of more than one sexually violent offense and a sentence is imposed for at least one of the offenses[.]" *Id*. § 841.003(b). On December 21, 1989, after pleading guilty pursuant to a plea-bargain agreement for an offense alleged to have occurred on July 22, 1988, Ybarra was placed on probation for a period of ten years for indecency with a child by contact. On June 14, 2016, Ybarra was sentenced in two separate cases involving two different victims. In the first case, the date of offense was February 5, 2003. Pursuant to a plea-bargain agreement, Ybarra pled nolo contendere to indecency with a child by contact and was sentenced

to six years of imprisonment. In the second case, the date of offense was April 15, 2005. Pursuant to plea-bargain agreement, Ybarra was also sentenced to six years of imprisonment. These two sentences ran concurrently with one another. Indecency with a child by contact is a sexually violent offense. *See id*. § 841.002(8)(A); *see* TEX. PENAL CODE § 21.11(a)(1). Thus, the evidence establishes that Ybarra is a repeat sexually violent offender.

Under the second element, a "[b]ehavioral abnormality" is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." TEX. HEALTH & SAFETY CODE § 841.002(2). In its brief, the State points to the testimony both Dr. Darrel Turner and Ybarra as factually sufficient evidence to support the jury's finding that Ybarra has a behavioral abnormality that it makes him likely to engage in a predatory act of sexual violence.

Dr. Turner, a clinical psychologist licensed to practice in Texas and Louisiana, testified as an expert witness in this case as a forensic psychologist. In giving his opinion regarding Ybarra's condition, he used a standard methodology that included reviewing records, interviewing the person in question, scoring psychological instruments, identifying factors that increase or decrease the person's risk, and then forming an opinion. He testified the records he reviewed and relied upon in forming his opinion are the same type of records as other evaluators review and rely upon when conducting behavioral-abnormality evaluations. He explained his opinion is not purely subjective, but is based on research and what that research indicates about sexually violent predators' "offending behavior and history, and their attitudes toward their victims." According to Dr. Turner, the records he reviews allow him to determine whether the person being evaluated was born with the condition or acquired it somewhere in the person's past. He testified he looks for patterns of antisocial activity and deviant sexual interests.

As part of his evaluation, Dr. Turner interviewed Ybarra. He also reviewed "[r]ecords relating to Mr. Ybarra's offending history, his sexual offenses and non-sexual criminal history." These records included prison records, Ybarra's deposition, detective narratives and witness statements relating to his offenses, court documents, charging instruments, and pen packets. When asked to explain why he relies on these types of records and does not "just" rely on his interview with Ybarra, Dr. Turner responded:

> [b]ecause the offenders don't always admit to everything that happened, not surprisingly. I think there are many reasons why that would be the case. And [the offenders] may not always remember things that happened as they happened. And so, records from that time that were official, and are official, and documented those events are very important for that reason.

Dr. Turner testified that when he finds inconsistencies in what the records tell him versus what the offender is saying, he confronts the offender with the inconsistency and gets a response. Dr. Turner explained that as part of his examination, he considers whether an offender presently suffers from the behavioral abnormality. In doing so, he also considers whether the behavioral abnormality is a congenital condition or was acquired. So, he looks "at historical information for that reason" and sees whether there is a pattern. He also considers "how antisocial or psychopathic" the offender is. Thus, Dr. Turner considers an offender's non-sexual offending history as well as his sexual offending history, because "it all speaks to [the offender's] level of antisociality, which is one of the biggest risk factors when you're looking at an offender's likelihood of re-offending." "Antisociality is very important on how likely [an offender is] to act out, break the rules, victimize other people, and feel entitled to do so, and then not feel remorse about doing so."

Dr. Turner further testified that as part of his evaluation, he considers sexual allegations made against the person he is evaluating. According to Dr. Turner,

> [I]n the field of sex offending, . . . we know from research that anywhere from five to twenty percent of sexual abuse instances are ever reported, so it's a small number. So, most of [sexual abuse instances] are not going to end in a conviction

> or even an arrest. So, we have to look at things like accusations and charges that don't result in convictions because there may be—you know, where there's smoke, there may be fire. So, we consider that information. You're asking if I consider it; of course I consider it. And I ask them about it in the evaluations to probe that.

Dr. Turner testified that he questioned Ybarra about allegations and charges that were made against him, and he relied on that information in forming his opinion—the same as other experts in his field. Ybarra's first sexual offense for which he was adjudicated was indecency with a child, and he was sentenced in 1989. The victim was Ybarra's stepdaughter S.A., who was eight or nine years old at the time. Dr. Turner testified that the records stated Ybarra had touched his stepdaughter's genitals, breasts, and bottom, and the abuse was "ongoing across a period of time" until he "ultimately" "engaged in sexual intercourse with her at that time when she was eight or nine." According to Dr. Turner, there "were many counts attached with the initial charging documents related to [Ybarra] touching [S.A.] on various dates, various body parts, and then ultimately engaging in intercourse with her." When Dr. Turner confronted Ybarra about sexually abusing S.A., Ybarra "initially made a blanket admission of all of his offenses." However, when Dr. Turner attempted to discuss the details of the offenses, Ybarra "backtracked and started denying aspects of the offenses, and it became clear that he was only admitting to a small portion of what actually occurred." Ybarra did not "admit to the most extreme portion of the abuse"—which in this case "was actually having intercourse with his eight-year-old stepdaughter." "What he admitted to was just some kind of petting or fondling, and he characterized it as joking." He further "characterized [the victim's] mother as being the instigator." Dr. Turner explained what was concerning "from a risk perspective is not only the offense, certainly the offense, *but his attitude about the offense and his characterization of his behavior and the victim's behavior and the victim's mother's behavior*." (emphasis added). According to Dr. Turner,

> To me this is getting to really the heart of the behavioral abnormality of Mr. Ybarra. What we see is, as a pedophile, as a pedophilic offender, someone who is sexually

attracted to pre-pubescent female children, he sees them in a sexual manner. He sexually desires female pre-pubescent children and desires sexual contact with them. But what we're seeing is—we're not seeing so much a blanket admission of that, what we're seeing is him really blaming the offense in a sense on the victims and painting himself as a bit of the victim who, you know, was manipulated and tricked or whatever, and finally gave in and was only trying to help. All of these other things, when, in fact, he groomed his victim, . . ., he offended against her multiple times and told her not to tell, you know, all of this stuff. And then ultimately he had sex with an eight-year-old female, and even still today is minimizing that and not admitting it in full, and [instead] saying he gave in because his wife really wanted him to have sex with her daughter.

He says things that just don't really make sense, but it's anything other than just admitting, "I'm a pedophile and a sex offender, and I committed this offense and it's awful," you know. It's the blame game and talking bad about the victim and the victim's mother, poor me, and that's what is going to increase that likelihood of reoffending. He's not getting it. He doesn't get it. He's going to get out there and see himself as the victim again and play the "poor me" game, and I think that that makes his risk escalate. No doubt.

Dr. Turner further explained that what Ybarra told him was "evidence of sexual deviance" and "evidence of pedophilia." Dr. Turner testified, "He's attributing sexual desires and motivations to this eight-year-old girl." Dr. Turner testified that in Ybarra's deposition, Ybarra stated that his stepdaughter S.A.

had come to him and ask[ed] him questions about his penis and how sex worked, so he was just teaching her—and this is a common story that we hear from pedophilic offenders, that it was a teaching thing. They will say they wanted to look out for the child before someone else could hurt the child so they wanted to teach them. And he had her in the bathroom holding his penis—his story has changed, but it's been while he was urinating and then masturbating him, and then he ejaculates and tells her that's how it works. So, this was a grooming process. This was something that he engaged in for his own sexual arousal. So to turn around and put it on her and blame her as though she was the one coming on to him, that's evidence of not only sexual deviance, but also of antisociality. He's being manipulative of her at the time, and he's been manipulative of us now. So it's evidence of the two biggest risk factors actually.

Ybarra further testified that someone who is antisocial "has no regard for other people or the rules of society."

They're out for themselves. They brazenly flout the rules. They're manipulative people [who] tend to lie pathologically and con other people to get what they want.

They don't feel remorse; they don't feel empathy towards other people. It's kind of a criminal predator outlook, "get what I want out of life and everyone else be damned" sort of attitude that tends to result in a lot of criminal behaviors.

When asked if these characteristics were present in Ybarra, Dr. Turner replied, "Yes, they are—to a concerning degree actually."

Dr. Turner noted that after Ybarra's first adjudicated offense with his stepdaughter S.A., he participated in a sex offender treatment outpatient program for two years. Ybarra told Dr. Turner that he had learned "how offenders misinterpret behaviors" of children. Dr. Turner testified, "[Ybarra] had studied it in treatment and been made aware of it, but then ultimately reoffended again after that treatment." Dr. Turner was asked how successful the treatment was for Ybarra. Dr. Turner replied, "Not at all." Dr. Turner testified that Ybarra reoffending after sex offender treatment was another risk factor that was supported by research. He testified,

> Research shows that when a sex offender has offended and engaged in treatment and then reoffended after treatment, that that offender is at an especially high risk to reoffend as compared to others [who] don't have that history. So, this is—this was a pattern that Mr. Ybarra, in response to your question, that in examination of these risk factors, there were so many risk factors that when investigated and accounted for . . . were present. There is a slew of risk factors present in this case. There are some protected factors, but the risk factors continue to be present and outweigh the protected factors.

Dr. Turner testified a "protected factor is something that if it's present, it either just keeps his risk level where it is or can actually reduce his risk level." Ybarra's "biggest protected factor is his age" of sixty years. Dr. Turner testified, "Generally, people [who] are sixty or older tend to be at a lower risk of reoffending." Dr. Turner noted that Ybarra has also been in some programs "and has gotten some training and some certificates, and he still communicates with his family, so there's some social support out there." Dr. Turner also noted that Ybarra had not been "getting in trouble for sexual things" while in prison and had "been educating himself and [enrolling in] self-improvement course and things of that nature." However, Dr. Turner explained that with "[m]ost

pedophilic offenders, the picture kind of looks like Mr. Ybarra." "They go to prison and behave well and fly under the radar." "They tend not to get in trouble or act out." Dr. Turner noted, "[T]here's no children in prison, so really his cup of tea is not there to be aroused." Dr. Turner continued, "So, it's not uncommon" for "pedophiles in prison to do well."

Dr. Turner further explained that after this first conviction, Ybarra was convicted twice more of offenses against two different victims. Both victims were related to him: his great-nieces G.L. and M.H. The older great-niece, G.L., was fourteen to sixteen years old during the period she was abused by Ybarra. Dr. Turner described how Ybarra groomed G.L. and fondled her breasts, genital area, and buttocks "[g]enerally over her clothes." When Dr. Turner asked Ybarra about G.L., Ybarra again minimized his actions:

> Well, [Ybarra] started off, again, by saying—you know, he admitted to everything that he was convicted of, but then when we got to the actual details of the offense, he . . . started to kind of back up and take some things back and say, "Well, you know, I poked her and teased her and we were, you know, tickling and squeezing and laughing and wrestling," which is another common excuse that we hear. So I told him, I said, "Well, you know, the events you're describing as just playing or teasing with her, but in her statement, she's outlining years of sexual abuse, which is quite different from what you're saying you did."
>
> And then again, you know, he would just minimize it and say he was just playing. It was just them playing. It was just poking and tickling, that sort of thing.

Ybarra's younger great-niece, M.H., was in the second grade and about seven years old when she was sexually abused by Ybarra. Dr. Turner testified that "there appeared to be more abuse of [the younger great-niece M.H.], more instances and more progressive abuse of [her] than there was of [the older great-niece G.L.]." Dr. Turner testified, "I think part of that is likely due to the fact that [M.H.] was in his preferred age range, whereas [G.L.] was a little bit older and post-pubescent." Ybarra fondled M.H. "on numerous occasions and told her not to tell anyone." According to Dr. Turner, Ybarra "had her masturbate him with her hands and had her masturbate him with her feet." Dr. Turner testified, "He would tell her, 'Come here and give me a nibble,' and

would want to suck on her breast." Dr. Turner continued, "He performed oral sex on her, his mouth to her vagina, and tell her that she tasted good and not to tell anyone." Dr. Turner testified that although Ybarra was convicted of one count of indecency with a child, he had been charged with multiple counts. When Dr. Turner was asked what Ybarra told him about offending against M.H., Dr. Turner replied,

> The same thing. He denied performing oral sex on her. He denied any of the masturbation with her feet or anything like that. But, you know, he admitted to the poking and the playing and the tickling. And that's sort of the same thing that we've heard from the other cases.

Dr. Turner noted that when Ybarra was asked in his deposition whether he was sexually attracted to children, Ybarra replied that he did not want to have sex with them, but admitted he did "want to fondle and touch them." According to Dr. Turner, "It doesn't work that way."

> He's just characterizing himself with what he sees as the mild or more acceptable part of his offending behavior. And that's a common tactic that we see when they try to rationalize their own offending in their head and then talk[] to other people. So that's a problem. That speaks directly to his current behavioral abnormality.

> Dr. Turner testified that he diagnosed Ybarra with pedophilic disorder, which was a chronic condition:

> That means that he has been, and will be, sexually attracted to female children throughout his life and for the rest of his life. It's not something that goes away or not something that makes him just want to touch them and not have sex with them. It is an attraction to female children. Just like whatever you're attracted to is . . . as real to you, that's as real as [it] is to him. And it's lifelong.

Dr. Turner testified Ybarra's pedophilic disorder is an acquired or congenital condition that affects his emotional or volitional capacity. When asked whether the condition was present at the time of trial, Dr. Turner replied it was because Ybarra was still attempting to manipulate people, lie, and shift the blame to the victims. Dr. Tuner explained that Ybarra had not accepted blame, nor did he have remorse.

Dr. Turner testified that Ybarra also had a history of non-sexual offenses, including a driving while intoxicated conviction in 2013 and a conviction for possession of cocaine in 1994. Dr. Turner explained those convictions were relevant to his evaluation because Ybarra's conviction for possession of cocaine and history of drug abuse "spoke" to "his antisociality." According to Dr. Turner, Ybarra's "history of alcohol abuse also speaks to antisociality." Dr. Turner explained that "[a]ny substance abuse, especially if it led to problems in [Ybarra's] life, legally or otherwise, speaks to antisociality."

Dr. Turner testified he also performed tests on Ybarra. On the Static-99R, Ybarra had a low score, indicating a below-average risk. Dr. Turner testified he believes the results of the Static-99R can be misleading and do not always show whether someone has a behavioral abnormality because it is an "actuarial" instrument, which "means it's going to put a range on him—his likelihood of being convicted if he reoffends." According to Dr. Turner, "I think that there's people with high scores [who have an] actually really low risk, and I think there's people with low scores [who] actually [have] a high risk, like in this case. So, I think it's misleading." Dr. Turner testified the Static-99R was just one tool to use out of many considerations: "And the authors say that too. They make it very clear that don't just give this test and use it. This is a tool, it's one picture of risk, but, again, if you have access to other data, you should certainly use that." Dr. Turner testified that he would never use the results of the Static-99R in isolation, explaining that the "two biggest risk factors, antisociality and sexual deviance" are "not even accounted" for in the test.

The other test Dr. Turner gave to Ybarra was the PCLR, which is "a measure of the degree to which someone has psychopathic traits or is a psychopathic individual." Dr. Turner explained that it was a "checklist" and had "twenty items." The highest possible score is 40, and the lowest possible score is zero. Ybarra's final score was twenty-six, which placed him "in the range of having . . . what the authors consider a high degree of psychopathic characteristics." Dr. Turner

testified that psychopathy was relevant to the question of whether Ybarra had a behavioral abnormality,

> [b]ecause he has this sexually deviant interest in children. Without enough antisocial psychopathy, he's going to feel remorse, he's going to empathize with those children and he's not going to be able to live with himself if he victimizes one of them. He's not going to offend again. But with enough psychopathy, enough lack of caring, enough self-centeredness, enough lack of emotion and empathy, he's going to have no problems acting out and offending. If he gets an urge or impulse, boom. That's the volitional control, or lack thereof. . . . His biggest risk factors are the fact that he is a pedophile, and the fact that he scores in the high range of psychopathic traits. And those two, especially when they co-exist, are an especially dangerous combination. . . .

> So, I'm just going to say that he has a high degree of psychopathic traits and is quite antisocial. . . . So that and the sexual deviant interest in pre-pubescent children. That's the second thing. The fact that he's already shown a propensity to reoffend after he's offended and been punished. We call that persistence after punishment, which is direct evidence of behavioral abnormality. That's it by definition. And then the fact we still see these deviant—blaming the children and not accepting what he did or seeing the full weight of what he did for what it is means that he doesn't get it and is not going to be as capable of stopping himself in the future.

> Then also he's a treatment failure. So, he's been in Sex Offender Treatment before and he has reoffended after being in Sex Offender Treatment for a couple of years. That increases his risk as well. So those are the primary risk factors . . . .

Ybarra also testified at the hearing. Consistent with Dr. Turner's characterization of Ybarra, when asked about his past three offenses against minors, Ybarra at first admitted to offending. However, when asked about specifics of the offenses, he minimized his actions. With regard to his conduct against his stepdaughter, S.A., he testified he had her lay down on top of him while they were both clothed and rubbed her along her pelvis in order to "create" an ejaculation. He denied the allegations contained in the counts to which he had not pled. Then, he blamed S.A.'s mother for his actions, claiming S.A.'s mother encouraged him to have sexual intercourse with eight-year-old S.A. Ybarra testified that he "reluctantly" allowed S.A. to "stay" in their bed while he and S.A.'s mother had sexual relations, but testified he never looked at S.A. while doing so. He

testified that he was unsure why he sexually offended against S.A. but admitted he had "abnormal thinking" and "wasn't thinking correctly."

Similarly, with respect to his conduct against his younger great-niece, M.H., he testified he touched M.H. "inappropriately" by "patt[ing] her on her behind," "grabb[ing] her breast," and "touching her vagina that one time." However, he then minimized his actions: "Well, this one time that I just recalled right now is when I was teaching her how to drive. My hand slid close to her and I touched her." He explained that M.H. was wearing clothes and that he touched her vagina over her clothing. When asked if he ever touched her vagina under her clothes, he replied, "Not that I remember." Similarly, he admitted to exposing his genitals to M.H., but explained he did so accidently when he exited the shower and did not do so for his sexual arousal. He denied the other allegations in the indictment relating to M.H.

He admitted that on the occasions he touched M.H., he later masturbated to those thoughts. He admitted that M.H. asked him to stop but he did not and that the sexual abuse occurred over a period of years. Ybarra was asked about specific incidents with M.H. but denied having abused her on those occasions. He was then asked the following:

> Q: So you, obviously, understand [M.H.] has said some of these other things happened, correct?
> A: Yes, ma'am.
> Q: So why do you think [M.H.] would say these things about you if they weren't true? . . . .
> A: I have no idea, ma'am.
> Q: Do you think there's some truth in what [M.H.] said that you just can't remember?
> A: Yes, ma'am, it's possible.

With respect to his older great-niece, G.L., he admitted to touching her "vagina over her pants," and her breast over clothes. He could not remember touching her other times; however, when asked if he would disagree with G.L. if she indicated it was under the clothes, Ybarra responded, "No, ma'am." He testified to one incident where he entered her bedroom uninvited

while she was sleeping and woke her up by tickling her. He claimed he entered her bedroom to

retrieve "something out of the room." He did not recall groping her breasts but admitted to touching

her butt. When asked whether he did so to gratify his sexual desire, Ybarra replied,

> Mainly to be irritable—that's why I did it at that time. The touching that we're talking about, it was mainly because I knew that she—it upset her and I was being irritable. I was just being—what's the word? Like mean I guess. I was being mean.

Ybarra denied, however, touching G.L. with any intent to arouse himself sexually. Ybarra was

then asked why he would plead nolo contendere to indecency with a child by contact:

> Q: You pled to doing this with the intent to arouse or gratify your sexual desire, correct?
> A: I don't remember exactly. I know that—I don't remember exactly what I pled. Is it in here?
> Q: Yes, Count 1, you pled nolo contendere to, and it specifically says with intent to arouse or gratify your sexual desire.
> A: Yes.
> Q: But today you're telling this jury you did not do that with intent to arouse your sexual desire?
> A: Oh, yes. No. I did it to like kind of like to harass her, but then there w[ere] other times that I did it for like the paper says, like for personal arousal.
> Q: In fact, you would go home after touching her and you would masturbate?
> A: Yes, ma'am.

Ybarra was asked to characterize what he did to G.L. He responded,

> I molested her. I went against her will. I touched her against her will. I disrespected her. I showed no consideration towards her feelings, or I didn't' think about anything that—I didn't think about the consequences.

Ybarra was then asked why he sexually offended against his younger great-niece, M.H. He replied,

> For the same reason as I said before, it was my train of thought, my mentality, my frame of mind that I had at the time. I was very immature and selfish. I wasn't thinking about anybody else other than myself.

Ybarra admitted he "knew that it was wrong," but explained he "didn't consider the

consequences." He also admitted that his offenses against G.L. and M.H. occurred after he had

been on community supervision for ten years for his offense against S.A. According to Ybarra, he

is no longer sexually aroused by children and has not been for the past three years. He testified

that he practices "positive thinking"—that is, when a negative thought enters his mind, he replaces it with a positive thought. He testified that he did not need any further sex offender treatment because he had overcome the "spiral" or cycle that kept him in "sexual sin." He testified that he now has control over his "triggers" and he can control his "thought process" to change his behavior by changing his plan and his thoughts. After his release from prison, he plans to purposefully avoid being in the company of children.

Ybarra further testified that prison had changed him. He attended college while incarcerated and obtained an associate's degree in business management. In addition, he completed many courses, including vocational training, Bible study, construction fundamentals, and carpentry. He also testified that he had become religious in prison and that it was against his religion to sexually offend against children.

In support of his argument that the evidence is factually insufficient to support the finding that he has a behavioral abnormality, Ybarra argues the following:

1. Although he admitted to committing indecency with a child by contact with regard to three different victims, he denied the more serious allegations in those respective indictments.

2. He has not received any prison disciplinary charge for sexual misconduct, possession of drugs or alcohol, or engaging in sexual relationships with other inmates. He has not been charged with a crime while incarcerated.

3. He testified alcohol and narcotics are no longer part of his life.

4. The protective factors reducing his risk to reoffend include his age, his productivity in prison, and his family support. Ybarra further argues that antisocial behavior generally tends to remit as a person ages, beginning around forty years of age. Ybarra is sixty years old.

5. His low score on the Static-99 indicates a low risk to reoffend.

Ybarra further makes several arguments attacking Dr. Turner's credibility. He argues that G.L. was not prepubescent at the time he engaged in inappropriate acts with her. He further emphasizes that at the time he sexually offended against G.L., he was married to G.L.'s mother

and "therefore had an appropriate romantic partner with an adult woman." He thus argues that the above facts "undermin[e] [Dr.] Turner's pedophilia diagnosis." First, a reasonable factfinder could conclude Ybarra offending against a post-pubescent minor does not equate to Ybarra not also being attracted to prepubescent children. Second, the jury could have reasonably concluded being engaged in a relationship with a minor while married to an adult woman does not support the proposition that Ybarra is able to control his impulses and engage in appropriate relationships.

Ybarra also argues that Dr. Turner did not rely on any research materials, *e.g.*, peer-reviewed articles or journals, for his opinion that Ybarra has a behavioral abnormality. He also complains about Dr. Turner's reliance on the PCL-R, which was not created for sex offenders but for inmates in general. He further contends that according to the DSM, males with pedophilic disorder begin to feel sexual attraction toward children about the time of puberty. Ybarra contends that because there is nothing to indicate he had a sexual attraction during puberty toward children, Dr. Turner's pedophilia diagnosis is "further undermin[ed]." These arguments, however, all relate to Dr. Turner's credibility. Dr. Turner testified as an expert witness without objection to his qualifications as an expert on these matters. The weight given to his expert opinion was a credibility question for the jury. *See In re Commitment of Stoddard*, 619 S.W.3d at 668, 677.

In reviewing all the evidence, we conclude the evidence is factually sufficient to support the jury's finding that Ybarra suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Although the protective factors pointed out by Ybarra above "may weigh against the risk that he might offend, no expert witnesses testified on [his] behalf, and so there is no opinion testimony in the record from an expert that contradict[s]" Dr. Turner's testimony that Ybarra "has a behavioral abnormality and is likely to reoffend." *In re Commitment of Gibbs*, No. 09-21-00232-CV, 2023 WL 5486229, at *7 (Tex. App.—Beaumont Aug. 24, 2023, no pet.). Dr. Turner considered the protective factors in this case but ultimately

rejected them and explained why he did so. *See id*. For example, Dr. Turner considered Ybarra's history of good behavior in prison, but explained good behavior is common in cases like Ybarra's because there are no children in prison. Dr. Turner also considered Ybarra's low score on the Static-99R, but explained why he did not rely heavily on this result in forming his opinion about Ybarra's condition. Additionally, Dr. Turner considered Ybarra's age but ultimately concluded other risk factors, including Ybarra's antisocial behavior, his pattern of minimizing his past conduct, his blaming of others, including the victims in his previous convictions, and his reoffending after completing sex offender treatment as reasons why he concluded that Ybarra has a behavioral abnormality that makes him likely to offend. The jury was entitled to accept Dr. Turner's explanation as reasonable, and to credit his testimony. *See id*. "On this record the jury could have reasonably concluded beyond a reasonable doubt that [Ybarra] has a behavioral abnormality that makes him likely to reoffend." *Id*.

Additionally, even though Ybarra contradicted some of Dr. Turner's testimony, the jury was free to disregard his testimony. *See id*; *see also McGalliard v. Kuhlmann*, 722 S.W.2d 695, 697 (Tex. 1986) (stating the trier of fact "may believe one witness and disbelieve others"); *see also In re Commitment of Mullens*, 92 S.W.3d 881, 887 (Tex. App.—Beaumont 2002, pet. denied). "Faced with two competing narratives, the jury chose to believe the State's evidence and disbelieve" Ybarra. *In re Commitment of Gibbs*, 2023 WL 5486229, at *7. The jury had the right in its discretion to credit Dr. Turner's testimony and to find it reasonable, and "we may not substitute our judgment for that of the jury, as it is the sole judge of the credibility and the weight to be given to the witnesses' testimony." *Id*. (citing *Stoddard*, 619 S.W.3d at 678). Based on this record, we hold the evidence is factually sufficient to support the jury's finding that Ybarra has a behavioral abnormality as defined by the SVP Act and is a sexually violent predator. *See Stoddard*, 619 S.W.3d at 678.

**ADMISSIBILITY OF EVIDENCE**

Ybarra argues the trial court erred in admitting evidence of unadjudicated offenses against him. First, Ybarra complains about the admission of the indictments relating to S.A., M.H., and G.L., arguing that the probative value of these indictments was substantially outweighed by the danger of their prejudicial effect under Texas Rule of Evidence 403. Second, Ybarra complains that the trial court compelled him to testify about the unadjudicated allegations contained in those indictments in violation of the Fifth Amendment.

### A. Standard of Review

We review evidentiary rulings for an abuse of discretion. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012); *In re Commitment of Gipson*, 580 S.W.3d 476, 486 (Tex. App.—Austin 2019, no pet.); *In re Commitment of Chapman*, No. 09-11-00561-CV, 2013 WL 4773231, at *2 (Tex. App.—Beaumont Sept. 5, 2013, pet. denied). "A trial court abuses its discretion when it acts without regard for any guiding rules." *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 142 (Tex. 2016). Because the trial court "has extensive discretion in evidentiary rulings," we "will uphold decisions within the zone of reasonable disagreement." *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 545 (Tex. 2018). Even if the trial court abused its discretion in admitting evidence, we reverse only if the error was harmful—in other words, if it probably resulted in an improper judgment. *U'Haul Int'l Inc.*, 380 S.W.3d at 144-45; *see* TEX. R. APP. P. 44.1. In determining whether any error probably caused the rendition of an improper judgment, "we must review the entire record." *Gunn v. McCoy*, 554 S.W.3d 645, 668 (Tex. 2018).

### B. Rule 403

Over Ybarra's Rule 403 objection, the trial court admitted in evidence Petitioner's Exhibits 2 and 3. These exhibits included the three indictments filed against Ybarra relating to S.A., M.H., and G.L. According to Ybarra, he "objected to the inclusion of the indictments as part of

Petitioner's Exhibits 2 and 3, because those indictments contained allegations of unadjudicated sexual offenses and should have been excluded" under Rule 403. Specifically, Ybarra stresses that for each indictment relating to S.A., M.H., and G.L., respectively, he pled to only one count of indecency with a child by contact; the other counts, which included allegations relating to aggravated sexual assault of a child, were never adjudicated. Ybarra argues any probative value relating to these allegations of unadjudicated offenses contained in the indictments was substantially outweighed by the danger of their prejudicial effect. *See* TEX. R. EVID. 403.

We first examine the relevancy of the counts in the indictments related to the unadjudicated offenses. Dr. Turner testified without objection that he relied on evidence relating to these unadjudicated offenses in forming his expert opinion about Ybarra. Rule 703 provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of, reviewed, or personally observed." TEX. R. EVID. 703; *see In re Commitment of Baiza*, 633 S.W.3d 743, 752 (Tex. App.—Houston [14th Dist.] 2021, no pet.). "The underlying facts and data need not be admissible for the opinion to be admitted." *In re Commitment of Baiza*, 633 S.W.3d at 752. "Under Rule 705, experts may disclose such facts and data on direct examination or be required to disclose them on cross-examination, and they may discuss prior offenses as part of the basis for their opinions, including the details of other sexual assaults even if they are unadjudicated." *Id*. (citing TEX. R. EVID. 705(a)). "Thus, even otherwise inadmissible hearsay may be admissible under Rule 703." *Id*. at 752-53. "But Rule 705 prohibits the proponent of the opinion from disclosing inadmissible facts or data 'if their probative value in helping the jury evaluate the opinion is outweighed by their prejudicial effect.'" *Id*. at 753 (citing TEX. R. EVID. 705(d)).

"Unadjudicated offenses are not necessarily more prejudicial than probative when they explain the basis of an expert's opinion." *Id*. Many appellate courts, including this court, have upheld a trial court's decision to allow an expert to testify about the details of unadjudicated

offenses in sexually violent predator commitment cases. *See id*. (holding that trial court could have reasonably concluded evidence relating to the respondent's unadjudicated offenses would be helpful to the jury in weighing the expert witness's testimony regarding the basis of his expert opinion); *In re Commitment of Guest*, 02-19-00295-CV, 2021 WL 1245087, at *8 (Tex. App.—Fort Worth Apr. 1, 2021, pet. denied) (holding trial court did not abuse its discretion by admitting evidence of unadjudicated sexual offenses because admission was not unfairly prejudicial); *In re Commitment of Johnson*, 613 S.W.3d 613, 618 (Tex. App.—San Antonio 2020, pet. denied), *cert. denied*, 141 S. Ct. 2686 (2021) (emphasizing that details of the respondent's unadjudicated offenses contributed to the expert witness's diagnosis of pedophilia and that "testimony about the underlying facts helped the jury weigh his diagnosis in order to decide whether they agreed that [the respondent] had a behavioral abnormality that would predispose him to commit sexual offenses" and holding "the trial court did not abuse its discretion by concluding that the evidence was admissible and would not be unfairly prejudicial"); *In re Commitment of Renshaw*, 598 S.W.3d 303, 314 (Tex. App.—Texarkana 2020, no pet.) (holding experts in civil commitments may disclose underlying facts that the expert relied on, including the details of adjudicated and unadjudicated sexual assaults); *In re Commitment of Grice*, 558 S.W.3d 323, 328 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (emphasizing that "[e]vidence concerning the facts underlying alleged previous sexual assaults has been ruled admissible in civil commitment cases when it assists the jury in understanding an expert's testimony that the person has a behavioral abnormality" and holding the trial court did not abuse its discretion by admitting evidence of two offenses that were originally charged as sexual offenses but were subsequently reduced to nonsexual offenses because admission was not unfairly prejudicial); *In re Commitment of Stuteville*, 463 S.W.3d 543, 555-56 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (holding

trial court did not abuse its discretion by admitting evidence of uncharged sexual offenses to explain basis of expert's opinion that defendant suffered from behavioral abnormality).

Similarly, in this case Dr. Turner explained to the jury how and why the underlying offenses and the unadjudicated allegations assisted him in evaluating Ybarra and in determining whether Ybarra has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Based on this record, the trial court reasonably could have concluded that evidence of the unadjudicated offenses, including the indictments at issue, would be helpful to the jury in weighing Dr. Turner's testimony—particularly with respect to Dr. Turner explaining the basis for his opinion that Ybarra suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See In re Commitment of Guest*, 2021 WL 1245087, at *8; *In re Commitment of Grice*, 558 S.W.3d at 328. Thus, we find no abuse of discretion in overruling Ybarra's Rule 403 objection to the admission of Petitioner's Exhibits 2 and 3.

### C. Self-Incrimination

Ybarra argues that because he invoked his right under the Fifth Amendment not to incriminate himself, the trial court erred in compelling him to testify about the unadjudicated offenses involving S.A., M.H., and G.L. The Fifth Amendment's "privilege against self-incrimination does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." *In re Espinoza*, No. 04-07-00598-CV, 2007 WL 4180216, at *2 (Tex. App.—San Antonio Nov. 28, 2007, orig. proceeding) (citing *Chapman v. State*, 115 S.W.3d 1, 5 (Tex. Crim. App. 2003)). Thus, it "may be asserted in civil cases when 'the answer might tend to subject to criminal responsibility him who gives it.'" *Id*. (quoting *Tex. Dep't of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 760 (Tex. 1995)).

"Blanket assertions of the Fifth Amendment privilege are not permitted in civil cases." *In re Commitment of Chapman*, 2013 WL 4773231, at *10. "Because the trial court has a duty to consider the merit of the application of the privilege against self-incrimination for each question for which it is asserted, the assertion of the privilege must be raised in response to each specific question or it is waived." *Id*. Further, when a witness invokes the Fifth Amendment to a specific question in a civil case, the jury is free to draw a negative inference. *See* TEX. R. EVID. 513(c); *see also Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *Wilz v. Flournoy*, 228 S.W.3d 674, 677 (Tex. 2007) (per curiam); *In re Commitment of Gipson*, 580 S.W.3d at 486; *In re Commitment of Pineda*, No. 02-20-00200-CV, 2021 WL 3796118, at *3 (Tex. App.—Fort Worth Aug. 26, 2021, no pet.). Here, however, instead of allowing the jury to draw a reasonable inference from Ybarra's invocation of the Fifth Amendment to the specific questions posed by the State regarding the unadjudicated offenses at issue, the trial court ordered Ybarra to answer.

A "witness invoking the privilege against self-incrimination is entitled to introduce evidence to show that an answer is likely to be hazardous to him." *In re Espinoza*, 2007 WL 4180216, at *3; *In re Speer*, 965 S.W.2d 41, 46 (Tex. App.—Fort Worth 1998, orig. proceeding). "It is the trial court's duty to consider the witness's evidence and argument on each individual question and determine if the assertion of the privilege against self-incrimination is meritorious." *Id*. (citing *In re Speer*, 965 S.W.2d at 46). "The trial court must study each question for which the privilege is claimed and must forecast whether an answer could tend to incriminate the witness in a crime." *Id*. Thus, "before a trial court may compel a witness to answer a question, it must be 'perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer(s) cannot possibly have such tendency to incriminate.'" *Id*. (quoting *Hoffman v. United States*, 341 U.S. 479, 488 (1951)).

The State argues that Ybarra has not preserved error because the record reflects that the trial court at first indicated it did not intend to compel Ybarra to answer questions about the unadjudicated offenses contained in the three indictments. The record reflects that the trial court then took a brief recess, after which the trial court indicated it had reviewed documents in chambers and determined that it was going to compel Ybarra to answer the State's questions about the unadjudicated offenses in the three indictments. According to the State, the "documents the trial court reviewed—the documents that persuaded the trial court to change its rulings—were not made a part of the record of this civil case." The State argues that "[w]ithout knowing exactly what the trial court reviewed," we cannot "determine whether the trial court's ruling was an abuse of discretion." In response, Ybarra argues that it was clear from the record which documents the trial court was reviewing: the three indictments relating to S.A., M.H., and G.L. We conclude that we need not decide whether Ybarra preserved error or whether the trial court abused its discretion in compelling his testimony because it is clear from the record that any such error is harmless.

We will not reverse a trial court's judgment because of an erroneous evidentiary ruling unless the ruling probably, though not necessarily, caused the rendition of an improper judgment. *Gunn*, 554 S.W.3d at 668; *U-Haul Int'l, Inc.*, 380 S.W.3d at 136; *In re Commitment of Hale*, No. 02-21-00373-CV, 2023 WL 2325199, at *11 (Tex. App.—Fort Worth Mar. 2, 2023, pet. denied); *see also* TEX. R. APP. P. 44.1. "The complaining party must usually show that the whole case turned on the evidence at issue." *In re Commitment of Hale*, 2023 WL 2325199, at *11 (citing *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) (op. on reh'g), and *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753-54 (Tex. 1995)). In determining harm, we examine the entire record. *Gunn*, 554 S.W.3d at 671. Here, because it was undisputed that Ybarra was a repeat sexually violent offender, the only contested element that the State had to prove was that

Ybarra suffered from a behavioral abnormality that made him "likely to engage in a predatory act of sexual violence." *See* TEX. HEALTH & SAFETY CODE § 841.003(a).

The record reflects that after Ybarra invoked his Fifth Amendment right to the questions posed by the State regarding the unadjudicated offenses relating to S.A., M.H., and G.L., and was then compelled by the trial court to answer, he generally denied committing the offenses or testified he did not remember committing the offenses.[1] For example, when questioned about one of the unadjudicated counts involving S.A., the following exchanged occurred:

Q:      Now we're on Count 1. Did you penetrate [S.A.]'s vagina with your penis?

Defense Attorney: I'm going to advise my client under Section 10, Article 1 of the Texas Constitution and Fifth and Fourteenth Amendment[s] [to] the United States Constitution not to answer the question.

Court: Sir, is your intention to follow your counsel's advice?

Ybarra: Yes, sir.

Court:  I'm going to order you to answer the question. Go ahead.

Ybarra: Can you ask me the question again?

Q:      Of course. Did you penetrate [S.A.]'s vagina with your penis?

A:      No, ma'am. I didn't.

In denying the allegations, Ybarra did not incriminate himself.[2]

---

[1]Ybarra was also questioned about the offenses to which he pled and was adjudicated guilty. Because he was convicted of those offenses, any questions relating to them could not have further incriminated him. *See Tex. Dep't of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 760 (Tex. 1995) (holding privilege under Fifth Amendment applies only if answer tends to subject a person to criminal responsibility).

[2]We note Ybarra argues that even "a witness who denies all culpability may have a valid Fifth Amendment privilege against self-incrimination." For support, he relies on the legal proposition that even when a witness has pleaded guilty and has been sentenced in connection with the offense, he may still invoke his privilege against self-incrimination because if his testimony contradicts any previous judicial admissions, he could subject himself to a charge of perjury. The Texas Court of Criminal Appeals, however, has explained that this legal proposition is "no longer good law" and has "essentially been overruled by the Supreme Court in *United States v. Wong*, in which that Court held that the Fifth Amendment does not condone perjury.'" *Martinez v. State*, 91 S.W.3d 331, 338 (Tex. Crim. App. 2002) (quoting *United States v. Wong*, 431 U.S. 174, 178 (1977)). The court of criminal appeals emphasized that "not even the 'cruel trilemma' of self-accusation, perjury, or contempt permits the person who might be unconstitutionally compelled to

There were a few instances where, after being compelled by the trial court to testify about the unadjudicated offenses, Ybarra did incriminate himself. He admitted that he touched S.A.'s vagina once and had S.A. touch his penis once. He also admitted to kissing S.A. with his tongue, but blamed her for his conduct:

> For some reason she was coming up to me and kept placing her mouth over my mouth flatly, which I didn't understand why she was doing that. I couldn't understand. And one time out of so many times that she did it, I don't know if it was just—I don't know why I did it, but I just stuck my tongue out and she stuck out her tongue and that's how I kissed her, with my tongue and my mouth.

Similarly, when asked why he "act[ed] out sexually against [S.A.]," he blamed S.A.'s mother, testifying she "asked me to have sexual intercourse with her daughter." Ybarra testified he refused, and S.A.'s mother said, "Well, at least let her stay in the bed with us while we're having sex." Ybarra testified he "agree[d] to that," "reluctantly," and "finally gave in and . . . allowed [S.A.] to stay in the bed." With regard to M.H., he admitted to touching part of her genitals, her breast, and exposing his genitals. As for exposing his genitals, he explained it was not for his sexual arousal but was an accident.

The substance of Ybarra's admissions above relating to the unadjudicated offenses was also testified to by Dr. Turner, and Dr. Turner explained why the unadjudicated offenses were relevant to his expert opinion. "[T]he erroneous admission of evidence is generally harmless when it is cumulative of other evidence admitted during the trial." *In re Commitment of Haines*, No. 09-15-00526-CV, 2016 WL 3356571, at *5 (Tex. App.—Beaumont June 16, 2016, no pet.) (citing *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004)). Therefore, even if the trial court erred in compelling the incriminating responses at issue, such evidence was cumulative of other evidence to which Ybarra did not object, and any such error was harmless. *Id.*; *see also In re*

---

speak to speak falsely." *Id*. (citing *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 55 (1964)). "No matter how cruel the dilemma or trilemma, the commission of the crime of perjury is not an acceptable response." *Id*.

*Commitment of Green*, No. 09–13–00273–CV, 2013 WL 6529502, at \*3 (Tex. App.—Beaumont Dec. 12, 2013, no pet.) ("Even the erroneous admission of evidence is harmless when it is cumulative.").

Moreover, in considering the entire record, we conclude that the above unadjudicated offenses admitted to by Ybarra would not have probably caused the rendition of an improper judgment. *See In re Commitment of Hale*, 2023 WL 2325199, at \*11; *see also* Tex. R. App. P. 44.1. The crux of Dr. Turner's opinion that a reasonable fact finder could have found credible relied on Ybarra reoffending after completing sex offender treatment, Ybarra's minimization of his past conduct, Ybarra's blaming his past victims and others for his behavior, and Ybarra's unrealistic plan to prevent himself from committing future sexual offenses. We thus hold any error in compelling Ybarra to testify about the unadjudicated offenses was harmless.

## CONCLUSION

For the reasons stated above, we affirm the trial court's judgment and order of commitment.

Liza A. Rodriguez, Justice